John FEARANCE, Jr., Appellant,

v.

The STATE of Texas, Appellee.

No. 69024.

Court of Criminal Appeals of Texas, En Banc.

Dec. 7, 1988.

Rehearing Denied Feb. 15, 1989.

Certiorari Denied July 3, 1989.
See 109 S.Ct. 3266.

J. Blake Withrow, Preston DeShazo, Dallas, J. Thomas Sullivan, on appeal only, Santa Fe, N.M., for appellant.

Henry Wade, W.T. Westmoreland, Jr., Jim Burnham and Winfield Scott, former Dist. Attys., Dallas, Robert Huttash, State's Atty., Austin, for the State.

## OPINION

WHITE, Judge.

Appellant was convicted of capital murder. *See* V.T.C.A., Penal Code Sec. 19.-03(a)(2). After the jury made an affirmative finding of the three special issues submitted under Art. 37.071, V.A.C.C.P., the trial court imposed the penalty of death. This case is before us on direct appeal.

Appellant presents us with twenty-four points of error. The instant case is the

second trial of appellant for this offense. Appellant's first conviction was reversed and remanded by this Court. *Fearance v. State,* 620 S.W.2d 577 (Tex.Cr.App.1980) (on Motion for Rehearing, 1981). The factual summary in the opinion on rehearing reflects the facts of the offense as they were proven at both appellant's first and second trial. We will rely, where appropriate, on that statement of the facts.

Vicki Benavidez, her ex-husband, Roland and her two small children arrived at Vicki's home at approximately 11:30 p.m. on Thursday, December 22, 1977, having attended a motion picture. They found lights on which had not been on earlier when they left for the movie. They had gone out the back door which, when they returned, was bolted from the inside. Missing from the residence were Christmas presents, food, beverages, jewelry, two steak knives and a butcher knife. In addition, a key to the residence, which had been left on the television was missing. A report of this burglary was made to the Dallas Police Department.

Roland Benavidez agreed to spend the night because of the possibility that the burglar, who now had a key to the residence might return. Vicki and Roland retired sometime after midnight.

Meanwhile, in her nearby, two-story house, Betty Faircloth fell asleep in bed on the evening of December 22, 1977, with the bedroom television on. Her husband, Larry Faircloth, woke her up and told her that someone had broken into the house; the Johnny Carson Tonight Show was on at the time. She got out of bed and saw that the stairway light was on. It had not been on earlier. At this point appellant came into the bedroom and a struggle between appellant, Larry and Betty ensued. Appellant stabbed Betty in the abdomen with a knife. Betty went to the phone to call the police as appellant was stabbing Larry. Larry fell face down on the bed, appellant straddled him and stabbed him a number of times in the back. Appellant then came toward Betty, who turned her back to him to protect the telephone,

and stabbed her twice in the back. Larry stood up, only to fall back to the floor; appellant ran from the room.

Betty completed her call to the police, though not without difficulty. The stab wounds had penetrated both her lungs and she was having problems breathing. Betty then went downstairs to await the arrival of the police and let them in. She was unable to get back upstairs.

*Fearance, supra,* at 581–582.

Betty Faircloth identified the appellant, in court, as the man who broke into their house and stabbed her husband and herself. Betty also testified that she did not give the appellant permission to enter her residence.

Back at Vicki's house, Roland Benavidez heard a key turn in the back door lock. The door could not be opened because it was also bolted. Roland arose and armed himself with a knife. He heard a key being turned in the front door lock; the door was secured with a chain. Roland went to the front door, unfastened the chain and jerked the door open. Appellant was there, his hands bleeding badly; he said that he ... would like to use the telephone. Roland shut the door and called the police. He gave the police a description of appellant and the clothing he was wearing and then went out into the front yard to await the police.

*Fearance, supra,* at 582.

At the instant trial, Roland Benavidez testified that he saw the handle of a knife sticking out of appellant's right front pocket. Concerning the wounds to appellant's hands, Dr. Linda Norton gave her professional opinion as a medical examiner that appellant could have suffered these injuries as a result of his own use of the knives during the attack.

The police broadcast, transmitting an account given by Betty Faircloth's report, initially characterized the incident as a shooting. Officer Hull and his partner, on patrol when they heard this call, went to the Faircloth residence; they were admitted by Betty Faircloth, who gave them a description of appellant and

the clothing he was wearing. They observed Larry Faircloth beside the bed in an upstairs bedroom in a large pool of blood. He was breathing heavily. Two ambulances arrived and took Larry and Betty Faircloth to Parkland Hospital where he died.

The autopsy indicated nineteen stab wounds and that Larry had bled to death. *Fearance, supra,* at 582.

At the instant trial, Dr. Linda Norton also testified about the nature of the wounds inflicted upon Larry Faircloth. Of the nineteen stab wounds, seven could be described as fatal: four to Larry Faircloth's chest and three in his back. Dr. Norton pointed out that the wounds on Larry Faircloth's hands were defense wounds.

Officer Jarvis of the Dallas Police Department Crime Scene Search Section arrived at the Faircloth residence. He ascertained that the molding which held the glass in French doors in the rear of the Faircloth residence had been removed and broken and that two panes of glass had also been removed. He took photographs of the French door and molding, but was unable to lift any readable latent prints. He also found a steak knife in a pool of blood under the edge of Larry Faircloth's bed.

*Fearance, supra,* at 582.

At the instant trial, this steak knife was admitted into evidence at the conclusion of Jarvis' testimony. Prior to that, Vicki Benavidez had identified the steak knife as one of the two taken from her apartment earlier on the evening of December 22nd. Dr. Linda Norton said the steak knife was consistent and compatible with the injuries found on Larry Faircloth.

Officer Meek, on patrol alone, heard over the police radio the report of the incident at the Faircloth residence and also of the prowler at the Benavidez residence; he answered the latter. He got a description of the prowler from Benavidez. Meek saw a trail of blood going away from the Benavidez residence. Meek was joined by officer Barber; while Barber radioed the description of the prowler Meek followed the trail of blood. The blood trail led to an apartment which was later determined to be appellant's residence.

Meek radioed a call for assistance from his patrol car and returned to appellant's apartment where he was joined by Officer Barber. Meek was aware that Officer Hull had made a broadcast from the Faircloth residence changing the shooting call to a cutting and stabbing call and giving a description of the suspect as a black male approximately 5'8" tall wearing a navy blue or black toboggan cap and a blue denim coat and pants which matched the description that Benavidez had given Meek. Meek knocked on the door, called out that he was a police officer and to open the door. A woman's voice responded, 'Wait a minute, wait a minute.' Meek was not sure whether she was talking to him or to someone inside, but she sounded frightened. When she opened the door, the officers rushed in and inquired as to the whereabouts of the man. The woman pointed to the bathroom. Appellant was found in there and was taken into custody. He was nude and was washing clothes in the bathtub full of water and blood. Officer Barber observed bloody clothes and bloody shoes on the bathroom floor and rags and clothes in the tub of bloody water. After appellant was handcuffed, Officer Barber undertook to determine whether anyone else was in the apartment who might attempt to harm the officers.

*Fearance, supra,* at 582–583.

In the instant trial, Barber testified that he seized various items of property that he observed in plain view in the apartment. In the bathroom, Barber seized several items of clothing which were bloody: A tobaggan, a pair of socks, two T-shirts, a pair of denim trousers and a pair of shoes. On the floor of appellant's bedroom, Barber found a bloody shirt. In the kitchen sink, Barber found a butcher knife with blood on it. Barber also found a denim jacket with blood on it. The pockets of the jacket contained several items: a box of

poker chips, a blue aluminum house key, a necklace and some rings, and a piece of wood molding. The jewelry and house key were identified as belonging to Vicki Benavidez. Irving Stone, Chief of the Physical Evidence Section at the Institute of Forensic Sciences in Dallas, testified in the instant trial that the piece of wood molding in the denim jacket matched pieces of wood molding taken from the back door of the Faircloth residence.

Samples were collected of the blood at appellant's residence, both inside and outside, the blood trail, blood at the Benavidez residence, and blood at the Faircloth residence.

Sara Williams, a forensic serologist, testified that she had examined known samples of appellant's blood and of the blood of the deceased. Through application of the ABO and MN systems, she determined that approximately .018 percent of the population had blood of appellant's type, and that .00354 percent of the population had blood of the type of the deceased. Among other things, Williams found that the blood on the steak knife was compatible with blood of the deceased as was the blood on the butcher knife.

*Fearance, supra,* at 583.

In the instant trial, Williams also testified that the blood samples taken at the front and back doors of the Benavidez apartment, the samples taken at the Faircloth residence and from the blood trail, and the samples taken at appellant's residence, all were of the appellant's blood type. Dr. Norton testified that the butcher knife taken from appellant's kitchen sink was consistent and compatible with sixteen of Larry Faircloth's stab wounds.

We will address appellant's twenty-four points of error in chronological order.

In points of error seven and eight (grouped by appellant), appellant attacks the validity of his indictment. Appellant claims it was error for the trial court to overrule his motion to quash the second paragraph of his indictment.[1] Appellant alleges that this paragraph violates the merger doctrine by relying on the act of murdering Larry Faircloth twice to create a capital offense. Appellant also claims that reliance on this paragraph to convict him cuts against the legislature's intent to narrow the class of intentional murderers subject to the death penalty, thereby violating his rights to due process and a fair trial.

■ Initially, we hold that the applicability of the merger doctrine of the felony murder statute (*see* V.T.C.A., Penal Code Sec. 19.02(a)(3)) is limited to cases of transferred intent. In *Barnard v. State,* 730 S.W.2d 703 (Tex.Cr.Ap.1987), we dealt with a similar argument:

Appellant contends the indictment is faulty because the State is 'bootstrapping' itself to a capital murder by using the shooting of Tuan Nguyen with a rifle

---

1. The indictment alleges that on or about the 23rd of December, 1977, the appellant did then and there

intentionally cause the death of an individual, Larry Faircloth, by stabbing and cutting the said Larry Faircloth with a knife, and the said John Fearance, Jr. did then and there intentionally cause the death of the said Larry Faircloth while the said John Fearance, Jr. was in the course of committing and attempting to commit the offense of burglary of the habitation of the said Larry Faircloth, located in the City of Dallas, Texas, in that the said John Fearance, Jr. did then and there intentionally and knowingly enter the said habitation of Larry Faircloth, without the effective consent of the owner, Larry Faircloth, with the intent to commit theft,

AND THE SAID GRAND JURORS AFORESAID do further present upon their oaths that

the said John Fearance, Jr., on or about the 23rd day of December, 1977, in the County and State aforesaid, did then and there intentionally cause the death of an individual, Larry Faircloth, by stabbing and cutting the said Larry Faircloth with a knife, and the said John Fearance, Jr. did then and there intentionally cause the death of the said Larry Faircloth while the said John Fearance, Jr. was in the course of committing and attempting to commit the offense of burglary of the habitation of the said Larry Faircloth, located in the City of Dallas, Texas, in that the said John Fearance, Jr. did then and there intentionally and knowingly enter the said habitation of Larry Faircloth, without the effective consent of the owner, Larry Faircloth, and commit the said murder of Larry Faircloth.

as the aggravating circumstance that converted a theft into a robbery and then using the same shooting of Tuan Nguyen with a rifle coupled with the robbery to elevate the offense to capital murder. He argues that it is impermissible to use the same aggravating factor for the robbery as is used to show the offense of murder. He relies on a felony murder case, *Garrett v. State*, 573 S.W.2d 543 (Tex.Cr.App.1978), for the proposition that when the State decided to allege the elements of robbery, which it was not required to do, it became necessary to allege an act other than the actual homicide as the element which made the underlying crime a robbery rather than a theft.

*Barnard, supra*, at 708.

V.T.C.A., Penal Code Section 19.03(a)(2) provides that a person commits capital murder if he commits a murder in the course of committing a burglary. V.T.C.A., Penal Code Section 19.02(a)(1) provides that a murder occurs when a person intentionally or knowingly causes the death of another individual. As this Court pointed out in *Barnard*, "Unlike the felony murder provision, V.T.C.A., Penal Code Section 19.02(a)(3), there is no transferred intent from a lesser offense to a greater offense under our capital murder statute. Rather under the capital murder statute, the commission of robbery is simply one of the circumstances which our legislature deemed to make the murder more deserving of the death penalty." *Barnard, supra*, at 709. In the instant case, the burglary of the Faircloth residence was such a circumstance.

■ Secondly, even if it can be assumed that the merger doctrine of the felony murder statute applies to capital murder prosecutions, the merger doctrine did not operate in the instant case to bar the appellant from prosecution for capital murder. Appellant has claimed that his conviction under Section 19.03(a)(2) cannot stand because, in the allegations made under V.T.C.A., Penal Code Sec. 19.03(a)(2), the State relied on the same act to constitute both an element of the underlying felony (burglary) and the allegation of murder. In light of our decision in *Aguirre v. State*, 732 S.W.2d 320 (Tex.Cr.App.1987), we disagree with appellant.

In *Aguirre*, this Court was faced with a conviction under the felony murder statute. The facts were:

> The appellant testified at trial that on the day of the offense he had gone to his ex-wife's home to speak to her about leaving the children alone at night. When his ex-wife refused to let him into the house, appellant went to his truck and retrieved his shotgun. He testified that he shot at the door in order to open it and did not consider the fact that someone could have been behind the door. Unbeknownst to appellant, one of his children was standing behind the door and was killed by the blast fired from appellant's shotgun.

*Aguirre, supra*, at 325.

This Court decided the defendant's prosecution for felony murder was not barred:

> If indeed, the appellant was engaged in felonious criminal conduct, that is committing felony crimical mischief by attempting to blow open a door with a shotgun, this conduct was clearly a property offense. In the furtherance of this offense, the deceased was shot and killed. Unlike the situation in Garrett v. State, supra,[2] the appellant's act of criminal mischief and the deceased's resulting homicide were not one in the same.

*Aguirre, supra*.

In the instant prosecution for capital murder, the indictment alleged and the proof showed that appellant was engaged in felonious criminal conduct, specifically, burglary at the time Larry Faircloth was murdered. This conduct was a property offense. Therefore, there was a showing of felonious criminal conduct other than the assault which caused the death of Larry Faircloth. Appellant's prosecution for capital murder was not barred by the merger doctrine.

---

**2.** *Garrett v. State,* 573 S.W.2d 543 (Tex.Cr.App. 1978).

■ Third, related to appellant's due process claim he claims a prosecution under the second paragraph of the indictment cuts against the legislative intent in the capital murder statute. According to appellant, that intent was to use aggravating circumstances (in this case, the property offense of burglary) to "genuinely narrow the class of people eligible for the death penalty and must reasonably justify the imposition of a more severe sentence on the defendant compared to others found guilty of murder." *Zant v. Stephens*, 462 U.S. 862, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983). In essence, appellant claims it was unfair for the State to treat him differently than any other defendant accused of intentional murder. We disagree.

Recently, the Supreme Court confronted this question in a cause arising from a capital murder prosecution in Louisiana. *Lowenfield v. Phelps*, 484 U.S. 231, 108 S.Ct. 546, 98 L.Ed.2d 568 (1988) (rehearing denied — U.S. ——, 108 S.Ct. 1126, 99 L.Ed.2d 286). In that case the State of Louisiana prosecuted the defendant for first degree murder, alleging that he intended "to kill or inflict great bodily harm upon more than one person." See La.Rev. Stat.Ann. Sec. 14:30(A)(3). This made him eligible to receive the death penalty, so long as the jury found one or more aggravating circumstances under Louisiana law. See La.Code Crim.Proc.Ann. Art. 9054 (West 1984). In support of the death penalty assessed in *Lowenfield*, the jury found the statutory aggravating circumstance of "knowingly creat[ing] a risk of death or great bodily harm to more than one person." Art. 9054(d), *supra*. The defendant argued to the Supreme Court that the

> sole aggravating circumstance found by the jury at the sentencing phase was identical to an element of the capital crime of which he was convicted. Petitioner urges that this overlap left the jury at the sentencing phase free merely to repeat one of its findings in the guilt phase, and thus not to narrow further in the sentencing phase the class of death-eligible murderers.

*Lowenfield, supra*, 108 S.Ct. at 553.

In the instant case, appellant makes the identical claim that the jury's narrowing function was circumvented by the second paragraph. Appellant asserts that paragraph meant the jury did not have to find an underlying felony to aggravate the intentional murder to capital murder.

In *Lowenfield*, the Supreme Court rejected the defendant's argument:

> Here, the 'narrowing function' was performed by the jury at the guilt phase when it found defendant guilty of three counts of murder under the provision that 'the offender has a specific intent to kill or to inflict great bodily harm upon more than one person.' The fact that the sentencing jury is also required to find the existence of an aggravating circumstance in addition is not part of the constitutionally-required narrowing process, and so the fact that the aggravating circumstances duplicated one of the elements of the crime does not make this sentence constitutionally infirm. There is no question but that the Louisiana scheme narrows the class of death-eligible murderers and then at the sentencing phase allows for the consideration of mitigating circumstances and the exercise of discretion. The Constitution requires no more.

*Lowenfield, supra*, at 555.

The Texas capital murder statute narrows the class of death-eligible murderers. Appellant's right to due process and a fair trial were not infringed upon. Points of error seven and eight are overruled.

■ In appellant's ninth point of error, he contends that his conviction is void because the prosecution was barred by the statute of limitations. He states that the instant offense was committed on December 23, 1977. His indictment was returned more than three years after this offense. Appellant contends that Art. 12.01, V.A.C. C.P. makes no provision for capital murder. Appellant states the general three year limitation provided for all offenses which are not specifically limited by Art. 12.01 applies to his case.

We disagree. In *Demouchette v. State*, 731 S.W.2d 75 (Tex.Cr.App.1986), this

Court rejected the same argument. This Court held that, "Capital murder is a species of murder and as such is provided for by Art. 12.01(1)." *Demouchette, supra,* at 80. Therefore, there is no limitation for the offense of capital murder. Point of error nine is overruled.

■ In his twelfth point of error, appellant states the trial court erred when it overruled his plea to the jurisdiction of the court. Appellant's argument is based upon the reversal of his first conviction. *Fearance, supra.* After the reversal, appellant petitioned the Supreme Court of the United States for a writ of certiorari. Because the Supreme Court had not acted on his petition when this cause was called for a retrial, appellant argues that the trial court was without jurisdiction and authority to try this cause. Specifically, appellant asserts, "In the instant case, had the United States Supreme Court granted appellant's petition, it would have exercised its jurisdiction to consider all matters raised by his petition and could have issued a binding decision in the case which would have precluded an exercise of the trial court's jurisdiction, since appellant raised issues focusing on prior jeopardy." We find this argument unpersuasive.

After reversing his first conviction, this Court overruled appellant's motion for rehearing on May 27, 1981. This Court's mandate issued on June 12, 1981. At that time, appellant filed his petition for certiorari with the United States Supreme Court. There is nothing in the record to indicate that Court ever entered an order staying the mandate of this Court. Voir dire examination of the prospective jurors in this cause commenced on October 5, 1981. The Supreme Court denied appellant's petition on October 13, 1981. *Fearance v. Texas,* 454 U.S. 899, 102 S.Ct. 400, 70 L.Ed.2d 215 (1981).

If the Supreme Court had granted appellant's petition for certiorari, and if it stayed this Court's mandate, or if the Supreme Court had stayed any further proceedings in this cause, the appellant would be correct in attacking the trial court's authority to retry this cause. However, the Supreme Court took none of these three actions. We hold the trial court had both jurisdiction and authority to hear this cause. Appellant's twelfth point of error is overruled.

■ In his thirteenth point of error, appellant complains the conviction in the instant case is void because double jeopardy barred his retrial after his first conviction was reversed. Appellant contends that this Court's reversal of his first conviction "demonstrated error only in that portion of the proceedings which could logically affect the punishment assessed." In essence, appellant believes that when his conviction was reversed because of an error in jury selection, see *Fearance, supra,* his sentence should have been reformed to life imprisonment because "the only taint in the proceeding found in appellant's first trial related to potential improper infliction of death as a result of the *Witherspoon* qualification principles." Appellant cites no authority to support this argument.

In *Grijalva v. State,* 614 S.W.2d 420 (Tex.Cr.App.1981), this Court explained that even though a *Witherspoon* error "affects only the death penalty, it is not such error as would preclude the State from seeking the death penalty on a retrial," *Grijalva, supra,* at 425. In *Wallace v. State,* 618 S.W.2d 67 (Tex.Cr.App.1981), Judge Clinton wrote in his opinion, concurring in part and dissenting in part, that "Unlike a finding that evidence is legally insufficient, *Witherspoon* errors do not call into play the jeopardy prohibitions of the Fifth Amendment to the Constitution of the United States and of Article I, Section 14 of our Bill of Rights." *Wallace, supra,* at 79.

The reversal of appellant's first conviction because of a *Witherspoon* error in the selection of a juror did not bar his second trial on the ground that it violated the double jeopardy provision of the Fifth Amendment to the United States Constitution. Appellant's argument here is groundless. The thirteenth point of error is overruled.

■ Appellant argues eight points of error based upon jury selection in the instant case. In points of error twenty-one and

twenty-two, appellant complains that the trial court erred when it overruled his challenges for cause to two separate jurors. In point of error twenty-one, appellant states he should have been granted a challenge for cause against venireperson Billups because she expressed the belief that police officers are entitled to greater credibility than other witnesses. In point of error twenty-two, appellant states he should have been granted a challenge for cause against venireman Alsbrooks because Alsbrooks stated he would distort his answer to the special issues in order to arrive at a verdict for imposition of the death penalty. In each point of error, appellant claims it was error for the trial court to force him to use a peremptory challenge on Billups and Alsbrooks, respectively.

In Art. 35.15(a), V.A.C.C.P., the legislature set out the provision that both the State and defendant in a capital murder trial were entitled to fifteen peremptory challenges. The record in the instant case contains the trial court's master list of jury strikes. That list reveals that appellant used only twelve of his allotted fifteen peremptory challenges during the entire voir dire. Even though appellant claims he was erroneously forced to use two of his challenges, he still had three peremptory challenges left unused after the jury was selected. As such, appellant is unable to show this Court that he had to accept a juror on the panel which he would have struck if he had enough peremptory challenges available to him. *O'Bryan v. State,*

591 S.W.2d 464 (Tex.Cr.App.1979), and *Williams v. State,* 565 S.W.2d 63 (Tex.Cr. App.1978). Points of error twenty-one and twenty-two are overruled.

In point of error eighteen, appellant complains that it was error for the trial court to excuse venireman Engstrom for cause. Appellant claims the record is clear that Engstrom did not possess the type of moral or religious opposition to the death penalty which would have precluded his service. Appellant states Engstrom could find capital murder to be an acceptable mode of punishment for certain offenses. Appellant concludes it was improper to excuse Engstrom for cause.

The record before us reveals a different set of facts. On the trial court's master list of jury strikes, venireman Engstrom is not shown to have been excused for cause. Instead, that list reflects that Engstrom was struck from the panel on the exercise of a peremptory challenge by the State, the tenth of thirteen used by the State in the instant case. It is not necessary to address the issue of whether this was a proper challenge for cause. The State exercised one of its peremptory challenges on Engstrom.[3]

Point of error eighteen is overruled.

■ In his fifteenth point of error, appellant states the trial court erred in excusing venireman McNary because of an improper application of the *Witherspoon* standard for qualifying jurors. Appellant asserts that McNary's general opposition to the

---

**3.** The State did not exercise this peremptory challenge at the time that Engstrom's voir dire concluded. One venireperson was taken on voir dire after Engstrom. After she was excused, and before the next venireperson was called, the following occurred:

THE COURT: All right, Mr. Engstrom was disqualified by cause by the Court and I have reconsidered the matter and we'll get Mr. Engstrom back.

THE STATE: Your Honor, that will not be necessary. The State would exercise a peremptory challenge on Mr. Engstrom and that will be our strike number ten.

THE COURT: All right, so I don't need to have him brought back.

THE STATE: No, sir, you don't.

THE COURT: All right, and I credit you with one more strike.

THE STATE: Thank you.

THE COURT: Next juror, please.

Engstrom was the sixty-fourth member of the venire to be called for voir dire. The State exercised its peremptory challenge before the sixty-sixth member of the venire was called. A total of eighty four members of the venire went through voir dire.

Appellant did not object to this retroactive use of the peremptory challenge by the State. Appellant failed to preserve the error by not objecting. *Montoya v. State,* 744 S.W.2d 15 (Tex.Cr. App.1987); and *Franklin v. State,* 693 S.W.2d 420 (Tex.Cr.App.1985, reh. denied). Compare to *Grijalva v. State,* 614 S.W.2d 420 (Tex.Cr.App. 1980), reh. denied 1981).

imposition of death as a possible sentence did not disqualify him as a juror in a capital murder trial. Appellant bases his argument on the fact that the sentencing procedure in the capital murder scheme incorporated in Art. 37.071, V.A.C.C.P., only "requires the jury to respond to three special issues ..., if raised by the evidence at trial. McNary was not questioned and never stated under oath that he could not answer the special issues truthfully or in compliance with the trial court's instructions."

At the conclusion of the voir dire of venireman McNary, the following exchange occurred:

THE STATE: Would you, because of your strong convictions against capital punishment—cause you to automatically vote against capital punishment no matter what the facts?

A. (THE JUROR): Yes.

Q. (THE STATE): All right.

THE COURT: Regardless of what the facts—

THE JUROR: Regardless of what the facts, yeah.

THE COURT: All right, I think he's disqualified.

(THE STATE): Do you—

THE COURT: Any questions?

(THE STATE): —have any objections?

(THE DEFENSE): *I don't have any questions.*

THE COURT: That's all. Thank you very much. Go back downstairs. Take a ten minute recess. (emphasis added).

This record makes clear that venireman McNary's opposition to the death penalty would adversely influence his ability to comply with his oath as a juror. The record also clearly reflects that appellant did not offer any objection to the excusal of McNary. Appellant's argument that the excusal of McNary was improper was offered for the first time on appeal. Error, if any, was waived for purposes of this appeal. *Johnson v. State*, 698 S.W.2d 154 (Tex.Cr.App.1985); *Duff–Smith v. State*, 685 S.W.2d 26 (Tex.Cr.App.1985); *Hawkins v. State*, 660 S.W.2d 65 (Tex.Cr.App.1983); *Crawford v. State*, 617 S.W.2d 925 (Tex.Cr. App.1980, reh. denied 1981); *Russell v.*

*State*, 598 S.W.2d 238 (Tex.Cr.App.1980). Point of error fifteen is overruled.

In point of error sixteen, appellant states the trial court erred in excusing venireman Rhodes because of an improper application of the *Witherspoon* standard for qualifying capital jurors. Appellant argues, in his brief, "neither the questioning of the State or of the trial court established that because of his religious beliefs the venireman would automatically vote to acquit or 'no' in answer to one of the special issues in punishment, despite the evidence, to avoid imposition of the death penalty." As a result, appellant claims that venireman Rhodes was not properly disqualified.

During the voir dire of the venireman Rhodes, the following exchange occurred:

THE STATE: ... would you be in one of those groups or can you tell us whether or not you could ever personally serve and be on a death penalty jury where the death penalty was—

THE JUROR: I couldn't personally serve on account of religious beliefs.

THE STATE: Could not personally serve because of religious belief.

THE JUROR: Yes, sir.

THE STATE: Now—

THE COURT: (to the Defense Attorney) Do you have any challenge to that?

THE DEFENSE: I'm sorry, do I have any questions?

THE COURT: yeah, any challenge to that observation? I think the gentleman's clearly disqualified; he said his religious belief would preclude him from— That's all. Thank you very much. Go by the Central Jury Room and leave your name tag.

THE JUROR: All right, sir.

THE STATE: Thank you, Mr. Rhodes.

THE COURT: Terri Tisserand (the next venireperson).

Appellant failed to make any objection at trial to the disqualification of venireman Rhodes. Any error was waived by the appellant's failure to object. *Russell, supra; Crawford, supra; Hawkins, supra; Duff–Smith, supra;* and *Johnson, supra.* Point of error sixteen is overruled.

In point of error seventeen, appellant states the trial court erred when it excused venireman Jackson based upon an improper application of the *Witherspoon* standard. Appellant emphasizes that during questioning by defense counsel, Jackson hedged on whether he would deliberately vote "no" on one of the special issues because of his desire to not impose the death penalty. Appellant discounts the State's continued questioning of Jackson after appellant was finished. Appellant, in arguing that Jackson's disqualification was improper, unequivocally states that "it was necessary for the State to elicit the answer that the juror would automatically vote "no" regardless of whether the State proved the issue by evidence beyond a reasonable doubt." According to appellant, this would be the only way to properly disqualify a venireman under *Witherspoon* and *Adams*. Appellant points out that a Texas capital jury only answers special issues and does not assess the death penalty. Therefore, he states, a general opposition to the death penalty, no matter how strongly the venireman feels about that opposition, is not enough for disqualification.

During the voir dire of venireman Jackson, the following exchanges occurred:

"THE STATE: If the jury agrees with us and returns that guilty verdict, then we will present additional evidence in the penalty phase of the trial to aid you and the other jurors in answering the three questions that we'll talk about in just a minute. We will be contending that the answers to those three questions should be yes on all three questions. If the jury agrees with us on that and returns a verdict of yes answers on all three questions, then the Judge will sentence the Defendant to die, no ands, ifs or buts about it; that's the way it will be. Our contention in this case is and will be that death is the only just and proper verdict considering all the facts and circumstances in this case and considering the Defendant and all the evidence that the jury will have heard about the Defendant in both the guilt or innocence phase of the trial and the penalty phase of the trial.

"We tell you that now, we put our position right out on the table right now, that we are seeking, actively seeking the death penalty in this case, so we can ask you to share with us how you personally feel about the concept of capital punishment and the death penalty. Could you share with us now how you personally feel about this?

"A. (THE JUROR): Okay, I don't really feel that I could give the death penalty.

"Q. (THE STATE): You don't feel like you could give the death penalty?

"A. (THE JUROR): (Shakes head.)

"Q. (THE STATE): All right, sir. Now, your statement to me is clear as a bell, but the law requires me to take it perhaps several steps further just to make it real clear in the record and for all of us so we'll be sure that your feelings are as strong as you've indicated. The law first, I think, requires that I explain to you that these three questions that we're talking about that are in front of you—let me just let you look at them quickly. Well, not quickly; take as much time as you want. Have you had a chance to read them?

"A. (THE JUROR): (Nods.)

"Q. (THE STATE): All right, sir, I take it from your earlier statement that it really wouldn't matter what the three questions were, that your feelings against capital punishment are such that you just personally could not serve on a death penalty jury; am I correct about that?

"A. (THE JUROR): That's correct.

"Q. (THE STATE): All right, thank you, sir. If you have any questions of us about those three questions, be glad to discuss them, but, frankly, based on what you've told us, I don't know whether it's really necessary to go any further on those questions. Did you have any question about the three questions?

"A. (THE JUROR): No.

"Q. (THE STATE): All right, thank you. Now, let me go into now sort of a testing period, I guess—

"THE COURT: Is your position such that you just couldn't answer them regard-

less of the evidence if they result in the death penalty?

"THE JUROR: Just feel I couldn't agree with the death penalty.

"THE COURT: Talk a little louder, please.

"THE JUROR: I feel I couldn't agree with the—issuing the death penalty.

"Q. (THE STATE): No matter what the facts and circumstances?

"A. (THE JUROR): No.

"Q. (THE STATE): All right.

"THE STATE: Do you have any objection?

"THE DEFENSE: I'd like to ask him some questions, Your Honor.

"Q. (THE DEFENSE): ... So I guess the crucial question is that if you were, for some reason, any reason, sitting on the jury in a death penalty case and the State proved to you beyond a reasonable doubt in your mind that the answer to the questions were yes, yes, on both those questions, would you deliberately answer one of those questions no to avoid giving the Defendant the death penalty?

"A. (THE JUROR): I suppose not.

"Q. (THE DEFENSE): You feel you could follow the law and answer the questions according to the evidence presented during the trial?

"A. (THE JUROR): I suppose not.

"Q. (THE DEFENSE): You feel you could follow the law and answer the questions according to the evidence presented during the trial?

"A. (THE JUROR): I suppose—

"THE COURT: A little louder now; speak up.

"A. (THE JUROR): I'm kind of confused.

"Q. (THE DEFENSE): Mr. Jackson, you know that we have the death penalty statute and, really, regardless of how you feel about it or how I feel about it, the law exists. You understand that there's going to be a jury that sits here and sits in judgment of Mr. Fearance. Now, I'm sure you'd agree that Mr. Fearance or any person accused of a capital crime deserves a fair jury, wouldn't you say?

"A. (THE JUROR): Yes, sir.

"Q. (THE DEFENSE): Do you think because of your beliefs that you're any more or less fair a person in terms of evaluating the facts as anybody else?

"A. (THE JUROR): Perhaps I'm less, less than fair in personal feelings on the—on capital punishment.

"Q. (THE DEFENSE): What I'm asking you, sir, is: Do you feel that your ability to weigh facts would be less than the next fellow's?

"THE COURT: He's answered; he said he would probably be less than fair because of his strong, violently held opinions about the death penalty; am I right?

"THE JUROR: Yes, sir.

"THE COURT: Am I summing up your feelings?

"THE JUROR: Yes, sir.

"THE COURT: I'm going to excuse him.

"THE DEFENSE: Your Honor, we'd object—

"THE COURT: That's all. Take your exception. Go ahead, thank you. Do you have anything you want to ask him? I think he's—

"THE STATE: Your Honor, if I could just ask him a couple of more questions for the record, I'd appreciate it.

"THE COURT: All right.

"Q. (THE STATE): Mr. Jackson, you said right off the bat that you do not feel that you could give the death penalty, is that correct?

"A. (THE JUROR): Yes.

"Q. (THE STATE): Now, the Defense lawyer couched it in terms of distorting your answer on one of those three questions. You remember earlier I talked about us having to test how strong your convictions are against death—

"A. (THE JUROR): Uh-huh.

"Q. (THE STATE): —and frankly that's what the Supreme Court requires us to do, is, in effect, test how strong you feel

against the death penalty. And the way they do that is by just asking you point-blank: Do you feel so strongly against it that if you were forced on the jury against your will, knowing that you cannot personally be involved in sentencing someone to die, would you, in effect, have to misanswer one of those questions to be true to your conscience? And people who feel strongly against it would go that far; they would say yes—

"THE DEFENSE: Your Honor, I'll object to him telling the potential venireman what some people would do; it's irrelevant.

"THE STATE: Well, I'll rephrase it, Judge.

"Q. (THE STATE): What I'm getting at is: It is a method of testing how strongly your convictions are. And really, if you think about it, a person who does feel extremely strongly about it could not just blindly go in and ask—

"THE DEFENSE: Your Honor, I'll object; he's telling—

"THE COURT: Yeah, another person; just leave other people out of this case.

"Q. (THE STATE): How do you feel, sir? Do you feel so strongly about it that you would never feel that there would ever be circumstances where the death penalty would be acceptable?

"A. (THE JUROR): That—that's true.

"Q. (THE STATE): So would you therefore be unable to return yes answers on all three questions regardless of what the evidence is, knowing that if you return three yes answers he's going to meet his death?

"A. (THE JUROR): I—would probably sway my opinion.

"Q. (THE STATE): Pardon me?

"A. (THE JUROR): It would probably sway my opinion.

"Q. (THE STATE): All right. And therefore would you be unable to return a verdict of death by answering those three questions yes? Would you ever be able to return three yes answers on those questions?

"A. (THE JUROR): No.

"THE STATE: All right, we submit

"THE COURT: That's all. I think he's disqualified.

"THE DEFENSE: Your Honor—

"THE COURT: Take your exception.

"THE DEFENSE: I take exception.

"THE COURT: Thank you. Go about your business. Next juror."

In urging us to hold that Jackson was qualified, appellant would have us focus entirely on one answer Jackson gave to appellant's attorney: that Jackson supposed he would not deliberately answer "no" to a special issue in order to avoid giving someone the death penalty. Appellant argues that Jackson's general opposition to the death penalty is unimportant since a Texas capital jury does not actually assess the penalty of death.[4] In sum, appellant asserts Jackson was qualified to serve because he did not state unequivocally that he would vote no to the special issues regardless of the evidence. We disagree.

■ In order to assess Jackson's capacity to obey his oath and follow the trial court's instructions, we will not focus on only one answer or passage from Jackson's voir dire. We must examine the venireman's testimony as a whole. *Porter v. State*, 623 S.W.2d 374 (Tex.Cr.App.1981); *Pierce v. State*, 604 S.W.2d 185 (Tex.Cr.App.1980); *Vigneault v. State*, 600 S.W.2d 318 (Tex.Cr.App.1980); and *Cuevas v. State*, 575 S.W.2d 543 (Tex.Cr.App.1978). A single statement of a venireman cannot be controlling on its own. We will review the entire record of Jackson's voir dire to determine if Jackson's opposition to the death penalty would prevent or substantially impair his performance of his duties as a juror in accordance with his instructions and oath. *Wainwright v. Witt*, 469 U.S.

---

**4.** In the instant case, as can be seen from the record, venireman Jackson stated far more than his opposition to the death penalty. Jackson discussed, under questioning, how his opinions would affect his ability to function as a juror. Compare to *Hernandez v. State*, 757 S.W.2d 744 (Tex.Cr.App.1988).

412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985); and *Adams v. Texas*, 448 U.S. 38, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980).

■ Jackson's testimony indicates that his ability to comply with his oath as a juror and the instruction of the trial court would have been substantially impaired. Jackson began by telling the attorney for the State that he could not give the death penalty. The attorney for the State then had Jackson review the three special issues which he would have to answer at the penalty stage of the trial. Jackson acknowledged that it would not matter what the three questions were, and that he couldn't serve on a death penalty jury. Jackson told the trial court he felt he could not agree with the death penalty no matter what the facts and circumstances. Defense counsel then took Jackson on voir dire. Jackson told him that he supposed he would not deliberately answer one of the questions "no" to avoid imposing the death penalty. Defense counsel asked Jackson if he could follow the law and answer the questions according to the evidence, and Jackson responded that he was "kind of confused." Jackson then told defense counsel that he would be less than fair in evaluating the facts because of his personal feelings on capital punishment. The trial court then informed both attorneys that since Jackson said he would be less than fair, he would excuse him. The attorney for the State requested, and was permitted, to ask more questions of Jackson. He asked Jackson if he would be unable to return yes answers on the special issues regardless of the evidence, and Jackson said he would "probably sway" his opinion. The attorney for the State then asked Jackson, "Would you ever be able to return three yes answers on those questions." Jackson responded no. The trial court then granted the State's challenge for cause and the appellant objected.

Appellant asks us to take a restricted approach to resolving Jackson's qualifications to serve. Appellant emphasizes that Jackson failed to testify he would vote no to the special issues regardless of the evidence. Appellant believes this made Jack-

son qualified to serve. This theory runs counter to the spirit of *Wainwright v. Witt, supra,* in two ways. First, appellant's theory represents a return to the type of automatic decision making which was fostered by footnote 21 in *Witherspoon v. Illinois,* 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968). See footnote four in *Wainwright v. Witt,* 469 U.S. 412, 105 S.Ct. 844, at 851, 83 L.Ed.2d 841 (1985). This automatic decision making is not conducive to fairly evaluating the beliefs and attitudes of a venireman. Second, appellant's theory does not respect the deference to be paid to a trial court. Appellant would reduce the judge's role in voir dire to that of a census taker who does little more than mark down answers to a pre-arranged set of questions.

The printed record of a voir dire is not clear and simple enough for automatic decision making. For example, in the instant case, Jackson's answers were not always straightforward. Jackson was confused at times and the record reflects this. The trial court had to glean from Jackson's answers whether he would be prevented or substantially impaired from following his oath and instructions. As in the instant case, a trial court is faced with a far more difficult task than envisioned by the appellant.

It is a task which the trial court is uniquely capable of performing. When the record of voir dire is unclear, "there will be situations where the trial judge is left with the definite impression that a prospective juror would be unable to faithfully and impartially apply the law." *Wainwright v. Witt,* 105 S.Ct. at p. 852. This amounts to a finding by the trial court concerning the venireman's state of mind. This finding will be based upon many factors, including determinations of the credibility and demeanor of the venireman. *Wainwright v. Witt,* at p. 854; *Bird v. State,* 692 S.W.2d 65 (Tex.Cr.App.1985) cert. denied, 475 U.S. 1031, 106 S.Ct. 1238, 89 L.Ed.2d 346 (1986). If the entire record contains sufficient evidence to support a trial court's determination that a juror would be prevented or substantially impaired from obeying his

oath and following his instructions, deference must be paid to that determination.

In the instant case, the trial court found that Jackson could not be fair as a juror, due to his beliefs in opposition to the death penalty. Jackson admitted his beliefs were such that he could not vote yes to the three special issues. The record of Jackson's voir dire supports these findings. Point of error seventeen is overruled.

■ In point of error nineteen, appellant asserts the trial court erred in excusing venireman Epp based on an improper application of the *Witherspoon* standard for qualifying capital jurors. Appellant focuses on the last answer that Epp made on voir dire. Appellant states this shows Epp was equivocating on whether he would deliberately vote no to the special issues, regardless of the evidence. Appellant argues, "Mere equivocation is not sufficient to disqualify a capital juror who expresses reservation about being involved in the imposition of a death sentence."

During voir dire of venireman Epp, the following exchanges occurred:

"Q. (STATE): So tell us now, sir, how you personally feel about capital punishment in light of all we've talked about.

"A. (JUROR): I cannot honestly tell you I'm totally for it.

. . . .

"Q. (STATE): You have a right to feel exactly how you do. And we find that there really are three groups of people that we talk to when we're talking about the death penalty: . . .

"There's a third group of people who are opposed to it. They do not feel that it serves as a deterrent. They always feel that there may be some doubt that could crop up after it's too late and therefore they are against it for one or more reasons, religious reasons perhaps; conscience, their conscience tells them that it's not right; the way they were raised; just the inner feeling in themselves. For whatever reason, they are against it and they never, ever could personally serve and take pen in hand and answer those three questions yes,

all three of them. Even though the evidence intellectually convinced them that yes was the answer, they just never could perform that function and sign their name to the verdict form. Is that how you feel, sir?

"A. (JUROR): (No response.)

"Q. (STATE): Or how do you—

"A. (JUROR): I'm not—well, I'm hesitating because I'm not real sure. I'm not that firm in my mind about anything except—no.

"Q. (STATE): I'm sorry, sir?

"A. (JUROR): I could not—I cannot say that I am for the death penalty.

"Q. (STATE): Right.

"A. (JUROR): Very definitely. I am not religiously opposed to it, but, as I mentioned, the—and you mentioned, also, something could later occur that showed that the person was put to death in not—not a just—a just manner—

"Q. (STATE): Yes, sir.

"A. (JUROR): —and that gives me considerable reservations. I can't tell you that I'm totally against it for any specific reason.

"Q. (STATE): All right, well, maybe the better way to put it is that whether you're totally against it or just concerned about being involved in it, the question becomes: Could you personally serve on a death penalty case and return a verdict of death if the evidence convinced you intellectually that those three questions should be answered yes? . . .

" . . . If you know in your heart that because of your reservations you never could personally take pen in hand and give us three yes answers even if we proved it, then you would not be qualified to serve and that would be the end of it.

"A. (JUROR): I'm not sure I could, sir.

"Q. (STATE): Good enough. So you're saying that at this point in your life you're not able to tell us that you could give three yes answers even if the evidence convinced you that the answers should be yes.

"A. (JUROR): I'm not sure that I could.

"Q. (STATE): We're not asking you how you might feel in the future; we're asking only how you feel right now. And as you indicated, right now you cannot tell us that you will be able to answer those three questions based only on the evidence, is that—

"A. (JUROR): You mean three yes answers?

"Q. (STATE): Yes, sir.

"A. (JUROR): I cannot tell you that I could do that.

"Q. (STATE): ... So we have to sort of theoretically put you on the jury against your will, so to speak, to test how strong your feelings are. I know that's sort of a muddled way of putting it, but it's another way of asking whether or not you could ever give us three yes answers, even assuming that you've intellectually been convinced that all three answers should be yes, but you know that three yes answers equals death. And so the law requires me to ask it that way. Again, it may not be—the way I have to ask it to you may not be worded much better than those three questions, but this is what's required. Are you personally unable to answer those three questions yes, ever, no matter what the facts and circumstances?

"A. (JUROR): I don't believe I could answer all three of them yes under any circumstances—under all circumstances.

"Q. (STATE): Are there ever circumstances where death would be an acceptable penalty for you, that you personally could be involved in signing your name to the verdict form?

"A. (JUROR): I don't think so.

"Q. (STATE): Would you ever personally be able to answer those three questions yes, based on the evidence? That's another way of asking the same thing, I guess.

"A. (JUROR): Again, I don't think so.

"Q. (STATE): Would you therefore have to automatically vote against the imposition of capital punishment without regard to any evidence that might be devel-

oped at the trial? Again, I suggest it's another way of asking the same thing a little different. Would you automatically have to vote in such a way that the death penalty would not be inflicted?

"A. (JUROR): Probably.

"Q. (STATE): All right, sir.

"A. (JUROR): I can't—I can't answer those questions yes or no. I don't know.

"Q. (STATE): All right, you—

"A. (JUROR): Probably I could—

"Q. (STATE): I'm sorry, probably you could—?

"A. (JUROR): Probably I could not answer three questions yes.

"Q. (STATE): ... this is the final test to determine how strongly your feelings are. And if you tell us that 'I'd have to abstain or I'd have to misanswer one,' then you're obviously not qualified and that would be, hopefully, the end of it.

"A. (JUROR): I would try not to misanswer one, but I would probably abstain.

"Q. (STATE): Abstain from answer—

"A. (JUROR): Abstain from—

"Q. (STATE): Refuse to answer?

"A. (JUROR): Right.

"Q. (STATE): And are you firm and fixed in that feeling, sir, about how you feel right now?

"A. (JUROR): I am, the reason being that when the—news media information that I've had about a trial and subsequently other evidence comes up and someone has been put to death in an unjustified manner—

"Q. (STATE): That—

"A. (JUROR):—that when I'm on the jury I don't know where I am at that point, and that would be extremely difficult to be a part of that.

"Q. (STATE): All right. And it's that spectrum that causes you to just be unable to serve at this point?

"A. (JUROR): I cannot tell you that I would answer all those three questions yes under any circumstances, and I can tell you

that it would be with a great deal of reservation that I would answer them yes.

"Q. (STATE): Well—

"A. (JUROR): The—I would probably abstain from answering if it got to that point.

"Q. (STATE): . . . You ought to have reservations about the State's ability to prove the case because we have to prove it not just a little bit; we have to prove it beyond a reasonable doubt. And so we expect jurors to come in here assuming he's innocent and expecting us and making us prove our case. So I don't mean to run this thing in the ground, but are you telling us, sir, that you can't do it or that you just have reservations?

"A. (JUROR): I can't do it.

. . . .

"Q. (DEFENSE): But our Supreme Court has said the mere fact you have reservations doesn't mean you're disqualified. Of course, we'd all agree that a man accused of a serious crime is entitled to a fair jury. The ácid questions really is: In terms of those questions that are submitted to you, if the State proved to you beyond a reasonable doubt that the answer to those questions should be yes—and that's their burden; if they don't prove it, your obligation is to say no. But if they'd proved beyond a reasonable doubt to you each and every one, would you deliberately misanswer one of those questions or abstain to prevent the Defendant from getting the death penalty, despite what the law required?

"A. (JUROR): I would not deliberately misanswer one of them, but I would abstain.

"THE COURT: All right, I think that's— that's all. Thank you, sir.

"THE DEFENSE: Your Honor, we'd object to Mr. Epp being excused for cause."

Appellant interprets Epp's last answer as indicating that Epp's only problem is that he had reservations about how he would answer the special issues. Again as with venireman Jackson in point of error seven-teen, appellant overemphasizes the importance of one answer on voir dire.

In order to assess Epp's capacity to obey his oath and follow the trial court's instructions, we will not focus on only one answer or passage from Epp's voir dire. We must examine the venireman's testimony as a whole. *Porter v. State, supra; Pierce v. State, supra; Vigneault v. State, supra;* and *Cuevas v. State, supra.* A single statement of a venireman cannot be controlling on its own. We will review the entire record of Epp's voir dire to determine if Epp's opposition to the death penalty would prevent or substantially impair his performance of his duties as a juror in accordance with his instructions and oath. *Wainwright v. Witt, supra;* and *Adams v. Texas, supra.*

Epp's testimony indicates that his ability to comply with his oath as a juror and the instructions of the trial court would have been substantially impaired. Epp stated from the beginning that he was opposed to the death penalty and could not give three "yes" answers to the special issues, regardless of the evidence or the circumstances. Epp said he probably would automatically vote so that the death penalty would not result. Later, Epp mentioned that he would have "reservations" about answering yes. When immediately pressed with a decision between saying he could not answer the special issues or saying he only had reservations about them, Epp said "I can't do it."

Towards the end of his voir dire, Epp gave an indication that he was equivocating on his answers. This was not as significant as appellant would have us believe, Epp's only problem was with deliberately misanswering a special issue. Epp simply did not want to be dishonest. But Epp dealt with this dilemma by stating that he would abstain from voting on the special issues. Epp clearly did not want to vote yes on the special issues, regardless of facts or circumstances.

Epp's opposition to the death penalty rises to the level contemplated by *Wainwright* and *Adams.* Since he could not vote yes to the special issues regardless of

the evidence, to the extent that he would refuse to vote at all, his ability to obey his oath and follow his instructions would have been substantially impaired. Point of error nineteen is overruled.

In point of error twenty, appellant asserts the trial court erred in excusing venireman Harris based upon an incorrect application of the *Witherspoon* standard for qualifying jurors. Appellant points out that Harris stated he could vote "yes" on the special issues only if a member of his family was the victim. Appellant also states that Harris never said he would deliberately misanswer a special issue to avoid the imposition of the death penalty. Appellant sums up his argument in his brief, "This juror was improperly excused from service on appellant's jury since his responses were neither automatic nor unequivocal such that his service as a juror would clearly be impaired by his reservations about the death penalty."

During the voir dire of venireman Harris, the following exchanges occurred:

"Q. (STATE): Now, I'm telling you all this so that I can ask you now to tell us how you personally feel about the death penalty. Can you tell us how you feel?

"A. (JUROR): I don't believe I could vote to kill someone.

"Q. (STATE): All right. I think I understand how you feel. What you've said is in plain English and makes it as clear as it could be as far as I'm concerned.

. . . .

"Q. (STATE): Mr. Harris, I have to ask you questions, the law requires me to ask you some more questions to test, really, the depth and the strength of your feeling about you personally not being able to vote to kill somebody, and that's really what it boils down to.

"A. (JUROR): Uh-huh.

"Q. (STATE): First of all, can I ask you: What is the source of your objection or reservation to personally serving as a juror? Is it a religious concept, does your church teach that, or is it just a personal belief or what?

"A. (JUROR): Well, it's just personal. I mean I'd just hate to know that I was responsible for someone dying.

"Q. (STATE): Okay, well—

"A. (JUROR): Or even partly responsible.

"Q. (STATE): Are you telling us that you could never, ever vote for the death penalty under any circumstances?

"A. (JUROR): No, I wouldn't tell you that.

"Q. (STATE): Are you telling us that you would vote for the death penalty under certain circumstances.?

"A. (JUROR): Yes, I would.

"Q. (STATE): Can you elaborate on that a little bit?

"A. (JUROR): Well, if this had happened to someone in my family, then, of course, I'd want revenge, but, you know, I don't know these people and it didn't happen to me.

"Q. (STATE): Is that the only circumstances that you'd ever vote—

"A. (JUROR): I think—

"Q. (STATE):—is if it happened to your family?

"A. (JUROR): (Nods.)

"Q. (STATE): All right. Now, of course, you understand that if it had happened to your family, you wouldn't be—

"A. (JUROR): I know that.

"Q. (STATE):—they wouldn't let you serve on a jury because of that reason.

"A. (JUROR): Right.

"Q. (STATE): All right. Now, putting that aside, are you telling us that you could never, ever vote for the death penalty?

"A. (JUROR): Yes, I am.

"Q. (STATE): And, again, I'm probably asking the same question about three or four different ways, but I have to because the law says I have to. Are you telling us that you would automatically vote against the death penalty in all circumstances?

"A. (JUROR): Yes, I would.

"Q. (STATE): Except where your family was concerned.

"A. (JUROR): Where my family—right.

"Q. (STATE): ... Are you saying that you would always vote no on at least one of those questions to keep the Defendant from getting the death penalty because of your belief?

"A. (JUROR): Well, that would be hard to answer, always, you know.

"Q. (STATE): Except in the situation of your family.

"A. (JUROR): I don't believe I could be responsible for somebody dying.

"Q. (STATE): Well, I mean if we follow the logical extension of that, then you couldn't ever vote yes on all those questions, could you?

"A. (JUROR): Not if it meant the man's death, I couldn't.

"Q. (STATE): All right, now, that's what I'm talking about. I probably didn't make myself clear. If you answer those three questions yes, that's it.

"A. (JUROR): I know.

"Q. (STATE): He gets the death penalty.

"A. (JUROR): Right.

"Q. (STATE): Are you saying because of that, because of your personal belief, that you would answer at least one of those questions—

"A. (JUROR): At least one of them—

"Q. (STATE):—no?

"A. (JUROR):—no.

"Q. (STATE): In all circumstances—

"A. (JUROR): Yeah.

"Q. (STATE):—regardless of what the evidence—

"A. (JUROR): Yes, sir.

"Q. (STATE): Regardless of what the case is about?

"A. (JUROR): Yes, sir.

"Q. (DEFENSE): ... If the State proved beyond a reasonable doubt the Defendant was guilty, could you find him guilty of capital murder?

"A. (JUROR): Yeah, I could find him guilty of capital murder.

"Q. (DEFENSE): If you reached the punishment stage of the trial, are your feelings so strong about capital punishment that you would deliberately misanswer one of the questions? Even though the evidence proved the answer would be yes, you would answer it no; would you deliberately misanswer one of the questions to prevent the Defendant from getting the death penalty?

"A. (JUROR): I wouldn't deliberately lie, I'm sure. I mean I don't want to be responsible for anyone dying—

"Q. (DEFENSE): Surely, I certainly understand—

"A. (JUROR):—but—

"Q. (DEFENSE):—I know that this is not a task that you'd take on voluntarily, and you don't have to believe or not believe in the death penalty to be qualified as a juror. The real questions is: Could you follow the law? If the questions were presented to you and the evidence proved to you beyond a reasonable doubt the answer was yes to those questions, would you vote yes?

"A. (JUROR): If I believed he was guilty, I'd—I'd vote yes.

"Q. (DEFENSE): You could follow the law in that regard?

"A. (JUROR): I'm—I'm contradicting myself really. You'd have to—I mean you'd know that if I voted yes three times, the man would die.

"Q. (DEFENSE): Yes, sir.

"A. (JUROR): I don't believe I could kill him. I just—I just—I couldn't do it.

"Q. (DEFENSE): Well, are you saying that you would—

"THE COURT: You say you couldn't do it?

"THE JUROR: No, I don't believe I could, no, sir.

"A. (JUROR): Did I answer your question?

"Q. (DEFENSE): Would you deliberately misanswer or deliberately—

"A. (JUROR): Well, I would have to—

"Q. (DEFENSE):—abstain from answering—

"A. (JUROR):—if I didn't want to, you know, be responsible for him dying, I'd have to—I'd have to, you know, if I believed that he was guilty—

"THE COURT: I believe he's answered it.

"THE DEFENSE: I pass the witness.

"THE COURT: Thank you, sir. Sorry you had to wait so long.

"THE DEFENSE: We do object to him being excused for cause. We believe that based on his answers he's qualified."

Initially, appellant argues that Harris' suitability as a capital murder juror was established when he stated that he could answer "yes" to the special issues if the victim was a member of his family. Appellant claims that, under *Witherspoon*, it was improper to excuse Harris. This Court has ruled to the contrary several times. In *O'Bryan v. State*, 591 S.W.2d 464, 478 (Tex.Cr.App.1979) cert. denied, 446 U.S. 988, 100 S.Ct. 2975, 64 L.Ed.2d 846 (1980), this Court stated:

The ability to consider capital punishment as a tool of vengeance by a person aggrieved by the loss of a family member is surely not within the contemplation of *Witherspoon*.

Harris was not proven to be qualified by his assurance that he would vote yes to the special issues if the victim was a family member. *O'Bryan v. State, supra*; and *Bell v. State*, 724 S.W.2d 780 (Tex.Cr.App. 1986).

Appellant also contends that venireman Harris was qualified because his answers on voir dire "were neither automatic nor unequivocal" in opposition to the death penalty. Appellant states this established that Harris would not be "clearly" impaired in his service as a juror.

Again, as with veniremen Jackson and Epp, appellant complains Harris did not answer that he would automatically vote no to the special issues. Therefore, appellant believes Harris' bias against the death penalty was not proven with unmistakable clarity. Appellant would have us abandon the view of the forest in a search for a single distinctive tree.

In order to assess Harris' capacity to obey his oath and follow the instructions of the trial court, we will not focus our examination on only one answer or passage from the voir dire. We must examine Harris' testimony as a whole. *Porter v. State, supra; Pierce v. State, supra; Vigneault v. State, supra;* and *Cuevas v. State, supra*. A single statement of a venireman cannot be controlling on its own. We will review the entire record of Harris' voir dire to determine if Harris' opposition to the death penalty would prevent or sustantially impair his performance of his duties as a juror in accordance with his instructions and oath. *Wainwright v. Witt, supra;* and *Adams v. Texas, supra*.

In the instant case, the trial court found that Harris would be impaired. The trial court arrived at this opinion after witnessing all of the voir dire of Harris, including determinations of the credibility and demeanor of the venireman. *Wainwright v. Witt, supra;* and *Bird v. State, supra*.

After reviewing the entire record, we find there was sufficient evidence in the record to support the trial court's finding that Harris would have been prevented or substantially impaired from obeying his oath and following his instructions. Harris explained his personal opposition to capital punishment would not allow him to vote for the death penalty unless a member of his family was the victim. Counsel for the State explained to Harris that he should put that consideration aside, since he could not serve if the victim was in his family. The State then asked Harris if he would automatically vote against the death penalty in all circumstances, and Harris replied that he would. Harris then stated that he couldn't ever vote yes on the three questions if it meant the appellant would die. Harris then explained he would answer at least one of the questions no, in all circumstances, regardless of the evidence.

When the defense began to question Harris, he hedged on this last response when he stated that he wouldn't deliberately lie on the special issues, though he didn't want responsibility for someone dying. Harris then acknowledged he was contradicting himself. Harris asked defense counsel if the result of three "yes" answers from him meant the appellant would die. When defense counsel told Harris that would be the result, Harris emphasized that he just couldn't do it. The trial court then asked, in effect, how Harris would resolve the dilemma. Harris responded he would abstain from answering the special issues. The trial court then excused Harris on a challenge for cause.[5]

The evidence in the record before us is sufficient to support the trial court's decision that Harris' ability to obey his oath and follow his instructions would have been substantially impaired. Point of error twenty is overruled.

 In point of error twenty-three, appellant states the trial court erred by admitting into evidence certain exhibits which were seized in an "illegal" search. The police arrested the appellant and conducted the search without a warrant. Appellant argues there were no exigent circumstances to justify the arrest and search without waiting to obtain a warrant. From this, appellant claims that any evidence seized in the apartment should have been excluded. The State responds that the officer's entry into the apartment to make the arrest and the subsequent plain view search, were rea-

sonable under the circumstances of the instant case.

Officers Meek and Barber arrested appellant at an apartment which was later found to be the appellant's residence. In the instant case, the trial court conducted a hearing outside the presence of the jury to determine if the arrest and search were legal. We described the events leading to the arrest earlier in this opinion.

Meek testified he followed the trail of blood from the Benavidez residence to the appellant's apartment. He testified that he ran back to his squad car to radio for assistance. When he drove back to the apartment, he was joined by Officer Barber. At this time, Meek believed the person who stabbed the Faircloths was also the prowler at the Benavidez residence. He believed that same person was in the apartment. Meek said he "could see it (blood) was on the door and the doorknob and everything and it appeared to me the person had went into the apartment."

Meek explained why he thought he did not have time to secure an arrest warrant for the suspect in the apartment. He did not know the name of the suspect. Meek thought the suspect had "possibly forced his way into the apartment and was endangering the persons therein." Meek believed this represented an immediate danger. Meek stated it would have taken three hours to secure a warrant. Meek testified that he was concerned that the suspect would escape in the meantime.

5. In the record of the voir dire of veniremen Harris and Epps, the statements of the prosecuting attorney and the trial court indicate that Harris and Epps may have been sua sponte excused by the trial court. Anyone reading the cold record of this trial could make this interpretation because of the prosecuting attorney's aversion to the use of the phrase "challenge for cause."

However, other items in the record established the challenges for cause to Harris and Epps were made by the State. The trial court's master list of jury strikes reveals that Harris and Epps were both excused on the State's challenges for cause. At this point, we note that the record, as originally transcribed to this Court, failed to include this list. This Court had to order the clerk of the trial court to provide this list. Had this Court relied strictly on the record

sent to us, a different result may have been reached in this cause.

There were other, minor indications in the record that Harris and Epps were challenged for cause. Appellant's trial counsel indicated during voir dire that he believed Harris and Epps were excused on the State's challenges. In his brief on appeal, appellant does not argue Harris and Epps were sua sponte excused. Overall, the record supports our conclusion that Harris and Epps were challenged for cause.

The ambiguities in this record directly resulted from the use of innocuous phrases, such as "we submit the juror," to state a challenge for cause. In *Pyles v. State*, 755 S.W.2d 98 (Tex.Cr.App.1988), we noted that from 1971 to the present there had been little, if any, concern in Dallas County for this Court's suggestions to discontinue this practice. *Pyles*, n. 1, at 107.

When Meek knocked on the door, a woman's voice answered. To Meek, she sounded frightened and scared. He identified himself as a police officer and requested that she open the door. Meek testified the woman began screaming "wait a minute." The woman eventually opened the door and admitted the officers. Meek asked her, "Where is he?" She motioned in the direction of the bathroom, where Meek found appellant and placed him under arrest. Barber looked through the apartment for others who might attempt to endanger the officers. As set out earlier in this opinion, in his search Barber found various items of property that were in plain view.

The trial court ruled the police acted lawfully. Appellant objected that "any testimony regarding the search and any testimony regarding the circumstances or any of the evidence, based on *Peyton v. New York,* the Fourth Amendment to the United States Constitution, and Article One, Section Nine of the Constitution of the State of Texas." In his brief, appellant contends the State failed to meet its burden of proving exigent circumstances to justify the arrest and search.

 The validity of a warrantless arrest or search can only be decided in terms of the concrete factual situation presented by each individual case. *Brown v. State,* 481 S.W.2d 106 (Tex.Cr.App.1972). In the instant case, probable cause would exist if, at the moment of arrest, the facts and circumstances within the knowledge of Officer Meek and of which he had reasonably trustworthy information would warrant a reasonable and prudent person in believing that appellant committed the murder of Larry Faircloth. *Pyles v. State,* 755 S.W.2d 98 (Tex.Cr.App.1988); *Earley v. State,* 635 S.W.2d 528 (Tex.Cr.App.1982); *Britton v. State,* 578 S.W.2d 685 (Tex.Cr. App.1979); and *Brown, supra.* We must also determine if that reasonable and prudent person would be justified in believing the appellant would take flight if not placed in custody, and whether the conduct of the police unnecessarily created the likelihood of such an action by appellant. *West v. State,* 720 S.W.2d 511 (Tex.Cr.App.

1986) and *Pyles v. State, supra.* Lastly, since this arrest occurred inside a residence, we must determine if exigent circumstances existed which would justify Meek and Barber's entry into the residence. Article 14.05(2), V.A.C.C.P.

 Officer Meek had sufficient knowledge to reasonably believe that Larry Faircloth had been murdered in the course of a burglary, and that the suspect had committed that murder. In reaching this conclusion, we are not limited to consider only Meek's personal knowledge. Meek could act upon the basis of information relayed to him by other officers. *Tarpley v. State,* 565 S.W.2d 525 (Tex.Cr.App.1978). In addition, we can also rely on "the sum of the information known to the cooperating agencies or officers at the time of an arrest or search by any of the officers involved" in the search for the suspect. *Woodward v. State,* 668 S.W.2d 337 (Tex.Cr.App.1987), cert. denied 469 U.S. 1181, 105 S.Ct. 939, 83 L.Ed.2d 952 (1985); *Garrison v. State,* 726 S.W.2d 134 (Tex.Cr.App.1987); and *Pyles v. State, supra.*

In the instant case, Officer Meek had the benefit of the knowledge of the Dallas police officers who investigated the scene of the murder, who received Betty Faircloth's description of the suspect, and who followed the trail of blood away from the Faircloth residence. Meek also had the description of the suspect who attempted to enter the Benavidez residence shortly after the murder, as that description was relayed from Roland Benavidez. Meek then followed the trail of blood to the apartment. From all this, Meek knew that Larry Faircloth had been stabbed to death, that a suspect had been seen at the Benavidez residence, that he had a description of the suspect from both Betty Faircloth and Ronald Benavidez, and that the suspect then fled to the apartment. When Meek found appellant in the bathroom of the apartment, he recognized the clothing from Benavidez' description and saw the blood on the clothing and the appellant. Meek had satisfactory proof that a felony had been committed and that appellant committed that felony.

■ The threshold question on this point of error is whether Meek was justified in entering the apartment and arresting the appellant without waiting to secure a warrant. Article 14.04, V.A.C.C.P. sets out that an officer must have satisfactory proof that the "offender is about to escape, so that there is no time to procure a warrant." This means that there must be some evidence amounting to satisfactory proof, either related by a credible person to an officer or observed by the officer himself. *Fry v. State*, 639 S.W.2d 463 (Tex.Cr. App.1982); and *Dejarnette v. State*, 732 S.W.2d 346 (Tex.Cr.App.1987).

At trial in the instant case, Meek testified that it would have taken at least three hours to obtain the warrant from a magistrate. The arrest occurred in the pre-dawn hours of Friday, December 23, 1977. At that time, Meek did not have the name of the suspect, or a positive identification of the appellant. At that time, Meek did not know if the apartment was the residence of the suspect. Meek had the benefit of the evidence of the suspect fleeing from the scene of the murder and then, fleeing from the Benavidez residence. Meek received a description of the suspect and followed the trail of blood to the apartment. Meek had the benefit of the knowledge that appellant knew that Betty Faircloth called the police while the suspect was attacking her husband and herself. Meek testified that, in his own mind, the danger existed that the unknown suspect would continue to flee and escape if Meek waited to obtain a warrant. Based upon the totality of the facts, Meek was justified in pursuing the suspect and arresting him without securing a warrant. *West v. State, supra;* and *King v. State*, 631 S.W.2d 486 (Tex.Cr.App. 1982).

■ In the instant case, exigent circumstances also existed which justified Officer Meek in entering the apartment to make the warrantless arrest of the appellant. Article 14.05(2), V.A.C.C.P. Officer Meek testified that he believed the suspect would be seriously endangering the person or persons inside the apartment. Meek was aware the suspect had already committed one murder and attempted to commit another in the course of a burglary of the Faircloth's home. Meek was aware the suspect subsequently attempted to enter the Benavidez residence while still in possession of a knife. *Woodward v. State, supra; Garrison v. State, supra;* and *Pyles v. State, supra.* Also, Meek heard the woman's voice inside the apartment in response to his knock. At first, Meek testified, she sounded serious and frightened. Then she began screaming. These factors were sufficient exigent circumstances to justify an entry into the residence to complete the warrantless arrest of the suspect.

■ Appellant complains of the admission into evidence of the items seized pursuant to his arrest. The bloody clothes and shoes were legally seized because they were in plain view of the immediate area of the bathroom during the lawful arrest of the appellant. *Jones v. State*, 565 S.W.2d 934 (Tex.Cr.App.1978). Officer Barber testified that he then took steps to determine if there was anyone else in the apartment who could endanger the officers. During this investigation, he discovered in plain view other items that had blood on them. Barber seized these items, and they were admitted into evidence at trial. Officer Barber was justified in conducting this search as necessary for the protection of Meek and himself. *Nichols v. State*, 501 S.W.2d 107 (Tex.Cr.App.1973), and *Jones v. State, supra.* Point of error twenty three is overruled.

■ In his eleventh point of error, appellant argues "the evidence is insufficient to support the conviction because of failure of the state to prove that appellant committed the offense of murder during the commission of a burglary based on the lack of consent of the owner, Larry Faircloth."

In his brief, appellant points out that an essential element of the underlying felony of burglary in the instant case is the owner's lack of effective consent to appellant's entry into the habitation. Appellant argues that because the alleged owner, Larry Faircloth, failed to testify at trial that he did not give consent to appellant, the evidence is insufficient. At trial, Betty Fair-

cloth testified that neither she nor her husband gave consent to appellant to enter their habitation on the night of the instant offense.

In 20 Tex.Jur.3d, sec. 913, pp. 75–76, it is written, "Where the [alleged] owner is deceased at the time of trial circumstantial evidence is admissible to show his want of consent to the entry." *Taylor v. State*, 508 S.W.2d 393 (Tex.Cr.App.1974). This Court agrees with that principle of law.

The evidence at trial showed appellant broke into the Faircloth home in the middle of the night. Once inside, appellant confronted the Faircloths, stabbed Larry to death and attempted to stab Betty to death. It was also proven at trial that appellant broke into a neighbor's home without their consent and stole their Christmas presents. Also, Betty Faircloth testified appellant was a total stranger to her and her husband. The circumstantial evidence was sufficient to establish that appellant did not have the effective consent of Larry Faircloth. *Prescott v. State*, 610 S.W.2d 760 (Tex.Cr.App.1981). Point of error eleven is overruled.

In his fourteenth point of error, appellant argues that, "the trial court erred in refusing to charge the jury on the lesser included offense of murder, as specially requested by appellant." Appellant bases this argument on two alternative theories.

First, appellant contends that since there was no evidence at trial that appellant entered the habitation without the effective consent of Larry Faircloth, there was no evidence to support the allegation of the underlying felony of burglary of a habitation. Therefore, appellant contends, the evidence at trial raised the lesser included offense of murder.

We disagree. In point of error eleven, we held the evidence at trial was sufficient to prove Larry Faircloth's lack of consent. The lesser included offense of murder was not raised under this theory.

In the alternative, appellant contends that appellant did not intend to murder Larry Faircloth. Appellant argues the murder was unplanned and "motiveless"

(sic). Then, appellant argues that capital murder under V.T.C.A., Penal Code Sec. 19.03 requires a finding of intentional conduct, whereas murder under V.T.C.A., Penal Code Sec. 19.02 requires a finding of knowing or intentional conduct. Therefore, appellant contends, since he knew but did not intend to murder, the lesser included offense of murder was raised at trial. Appellant cites no legal authority to support this theory.

There is another problem with this theory. Appellant presented no evidence during his case in chief that he did not intend to kill Larry Faircloth. None of the witnesses for the State, on direct examination or cross-examination, testified that appellant's actions were unintentional. The evidence at trial did not raise the lesser included offense of murder. Point of error fourteen is overruled.

In his tenth point of error, appellant argues that the trial court erred in permitting reputation witness Michael Blumberg to testify at the penalty stage on appellant's reputation for being a peaceful and law abiding citizen. When appellant objected to Blumberg's testimony at trial, the trial court conducted a hearing on Blumberg's qualifications outside the presence of the jury. The trial court overruled appellant's objection that Blumberg was not qualified, and permitted him to testify.

In his brief, appellant contends that Blumberg's testimony was based solely upon Blumberg's personal knowledge of appellant's behavior while incarcerated at the Ellis Unit of the Texas Department of Corrections. Appellant points out that reputation testimony is not to be based upon specific acts of misconduct known personally to the witness. Instead, appellant explains, reputation testimony must be based upon what is heard in the community. Appellant states this means that Blumberg was not qualified to testify about reputation for being a peaceful and law abiding citizen.

After reviewing the record of Blumberg's testimony, we find that his opinion was not based solely on his personal experi-

ences with appellant's acts of misconduct. On voir dire, Blumberg stated that his opinion was based on his discussions with other prison guards at the Ellis Unit, not just on his own dealings with appellant.

In *Jackson v. State*, 628 S.W.2d 446 (Tex. Cr.App.1982), this Court held that a reputation witness' testimony must be based on discussions with others concerning the defendant, on hearing others discuss the defendant's reputation, and not just on personal knowledge. In *Castillo v. State*, 739 S.W.2d 280 (Tex.Cr.App.1987), this Court held that, "Discussions with other police officers are sufficient to qualify a witness on reputation, but reputation opinion must be based on facts or rumors other than the actions or offenses for which the defendant is being tried."

In the instant case, Blumberg's opinion on appellant's reputation for being peaceful and law abiding was not based on the facts of the instant offense. It was based on discussions with others at the Ellis Unit. Appellant's tenth point of error is overruled.

■ In point of error twenty-four, appellant states the trial court erred when it permitted the State's expert witness, Dr. Clay Griffith, to testify about an opinion which invaded the province of the jury at the penalty stage of the instant trial. The State called Dr. Griffith to give his opinion on the probability that appellant would commit future acts of violence that will constitute a continuing threat to society. This opinion was based on a hypothetical set of facts, which retraced the appellant's criminal history as proved up by the State. Appellant's only objection was that Griffith's opinion invaded the province of the jury.

In *Collins v. State*, 548 S.W.2d 368 (Tex. Cr.App.1976), cert. denied, 430 U.S. 959, 97 S.Ct. 1611, 51 L.Ed.2d 811 (1977), this Court held that an expert opinion based upon a hypothetical, such as Dr. Griffith's in the instant case, does not invade the province of a capital murder, at the penalty stage. In *Collins*, this Court held this type of testimony was pertinent at the penalty

stage of a capital murder trial on the second special issue of Art. 37.071, V.A.C.C.P.

■ In his brief, appellant also attacked Griffith's testimony because Griffith did not personally examine appellant. Appellant makes this objection for the first time on appeal, thereby preserving nothing for review. Also, the fact that Griffith did not examine appellant does not adversely impact on the pertinence of Griffith's hypothetical opinion. Point of error twenty-four is overruled.

■ Appellant groups his fourth, fifth and sixth points of error together into one argument. He complains of the trial court's failure to instruct the jury on the definition of deliberately (see Art. 37.-071(b)(1), V.A.C.C.P.). Appellant states in his fourth point of error the trial court erred when it refused to define deliberately. In his fifth point of error, appellant argues the trial court erred by not giving to the jury appellant's special requested instruction defining "deliberately":

> You are instructed that in considering the questions submitted to you in this, the punishment phase of the trial, the issues must be considered as separate and distinct issues in the trial.

> In question number one, the term 'deliberately' means resulting from careful and thorough consideration.

In his sixth point of error, appellant states the trial court erred by failing to give to the jury his special requested instruction on the "forethought and deliberateness of appellant's acts":

> You are further instructed that in considering punishment you may consider the circumstances surrounding the offense, the forethought and deliberateness exhibited by the defendant, John Fearance, Jr., in the commission of the offense.

The trial court instructed the jury by presenting the three special issues to them as set out in Art. 37.071. The instant case was tried in 1981. Since none of the terms in the issues are defined by statute, the trial court did not define those terms for the jury in its charge. The jury did not

send out a note during its deliberations requesting a definition of any of the terms in the charge.

The term "deliberately" is not defined by statute. This Court has held that deliberate is a word simple in itself and used in its ordinary meaning. *King v. State*, 553 S.W.2d 105, at 107 (Tex.Cr.App.1977); and *Esquivel v. State*, 595 S.W.2d 516, at 525 (Tex.Cr.App.1980). In *Nichols v. State*, 754 S.W.2d 185 (Tex.Cr.App.1988), this Court stated that "we have approximated its meaning in accordance with 'common usage' as something more than intentional," *Heckert v. State*, 612 S.W.2d 549, 552 (Tex.Cr.App.1981), and something less than premeditation, *Granviel v. State*, 552 S.W.2d 107, 123 (Tex.Cr.App.1976) ..., a "conscious decision involving a thought process which embraces more than mere will to engage in the conduct." *Lane v. State*, 743 S.W.2d 617, 628–631 (Tex.Cr. App.1987). Both of appellant's requested instructions were not necessary. Points of error four, five and six are overruled.

In his first point of error, appellant argues the trial court erred when it overruled appellant's objection to the prosecutor's argument at the penalty stage that appellant gave Larry Faircloth a death sentence without appeal. The prosecutor argued:

> STATE: And what value does this man put on life? What value does this man put on innocent life? Why, he took it upon himself to be judge, jury and executioner. He gave him the death sentence, folks. Blake doesn't believe in it, but his client believes in the death sentence, with no appeal. There are no appeals from the ones he gives, see.

Defense counsel made the following objection to the argument:

> DEFENSE: I'm going to object to his comment about appeals; I think it asks the jury to speculate into matters outside the record.

In his brief, appellant argues the prosecutor's statement asked the jury to punish appellant because his first conviction on this case had been reversed on appeal. Appellant claims the argument led the jury to speculate about appellant's right of appeal, so the jury would punish appellant for an appellate process beyond his control. Appellant cites no precedent in support of this argument, except to say the argument does not fit into one of the four permissible types of arguments set out in *Alejandro v. State*, 493 S.W.2d 230 (Tex.Cr.App.1973).

Appellant is mistaken about the implications of the prosecutor's argument. The statement that Larry Faircloth received a death sentence with no appeal did not encourage the jury to speculate about appellant's right of appeal. In the context of the entire argument, there were no references to the procedural trickery of defense lawyers, as there was in *Green v. State*, 679 S.W.2d 516 (Tex.Cr.App.1984). In the instant case, the prosecutor did not ask "the jury to speculate about extraneous factual matters the State is barred from introducing." Compare to *Green, supra.* The prosecutor did not ask the jury to speculate about the basis of a witness' testimony. Compare to *Montoya v. State*, 744 S.W.2d 15 (Tex.Cr.App.1987).

Instead this was an argument similar to the one heard in *Bell v. State*, 724 S.W.2d 780 (Tex.Cr.App.1986): "essentially they (victims) could not appeal their death sentence to a higher court." Objections to this argument were overruled. *Bell, supra,* at 802. The Court decided this argument was strongly disapproved of, but "not so egregious as to constitute reversible error". *Bell, supra,* at 803.

In addition, the overwhelming evidence against appellant at the penalty stage assures this Court that the argument made no contribution to the punishment received. Tex.R.App.Pro. Rule 81(b)(2). At the penalty stage, the State proved appellant was previously convicted of six felonies: theft on March 10, 1972; rape on November 6, 1972; theft on December 7, 1974; burglary of a habitation, attempted capital murder and aggravated rape on December 15, 1978. The State proved appellant's reputation for being peaceful and law abiding was bad. Three separate witnesses testified to unadjudicated extraneous offenses committed by appellant while incarcerated: an as-

sault on a prison guard at the Ellis Unit, an assault on a fellow inmate at the Dallas County Jail, and an arson at the Dallas County Jail. Dr. Clay Griffith also testified, as recounted earlier in this opinion. Point of error one is overruled.

■ In his second point of error, appellant complains of another argument by the prosecution at the penalty stage of appellant's trial. Appellant contends that the argument was a comment on the appellant's failure to testify. Appellant attacks the following argument:

> STATE: Listen to the samples of what the doctor said about this type of person: Repeated conflict with society; fits him like a glove. No guilt, no remorse; fits him like a glove.
> DEFENSE: Your Honor, I'll object to that argument as a comment on the Defendant's failure to testify.
> THE COURT: Overruled.

During the penalty phase of the trial, the State presented the testimony of Dr. Clay Griffith. At the conclusion of the hypothetical, Dr. Griffith explained that personalities like the appellant's personality show "no guilt. They show no remorse." The State's argument was not a comment on appellant's failure to testify. It was an argument summarizing the evidence presented by Dr. Clay Griffith during the penalty stage of the trial. There was no error. *Alejandro v. State,* 493 S.W.2d 230 (Tex.Cr.App.1973). Point of error two is overruled.

■ In his third point of error, appellant complains of another argument by the State during the penalty stage of the trial. Appellant contends the argument asked the jury to speculate on how long the appellant would serve in prison if he received a life sentence. Appellant attacks the following argument:

> STATE: We've sent him to the pen twice. That didn't get his attention. Go on down there for two sentences concurrent; total of four years in '72. Back out in '73. Five years. Back out in '77. He's talking about big life sentences. Don't be fooled, folks—
> DEFENSE: Your Honor, I'll—
> STATE: Don't be fooled by these life sentences.
> DEFENSE: Your Honor, I object to that; he's asking the jury directly to speculate about how long the Defendant would have to serve.

The trial court responded:

> The jury is not to concern themselves about the execution of sentence; I've instructed them on that.

The trial court denied appellant's request for a mistrial.

The State's argument was a response to two arguments by appellant:

> DEFENSE: And if you believe that the answer to one of those questions should be no, he'll have a fourth life sentence. And I'll submit to you that with four life sentences that Mr. Fearance isn't going to be a continuing threat to society.

Later, appellant expanded upon the argument:

> DEFENSE: I don't argue for one millisecond with you that it's your responsibility to put that individual in a place where he can be controlled, and I don't argue that at all. And I think by returning a decision of life in prison, you can do just that.

The State's argument was proper both as an answer to the argument of opposing counsel and as a summation of the evidence of appellant's previous incarcerations. *Alejandro, supra.* Point of error three is overruled.

Appellant's conviction is affirmed.

DUNCAN, J., concurs in the result.

CLINTON, J., dissents.

TEAGUE, Judge, dissenting.

I respectfully file this dissenting opinion. For reasons that I will give, John Fearance, Jr.'s conviction for capital murder and death sentence should be set aside, and not affirmed. Henceforth, I will refer to Fearance as appellant.

I find that the majority opinion erroneously disposes of appellant's point of error

numbered seven, which asserts the following: "The trial court erred in overruling appellant's timely motion to quash the second paragraph of the indictment, which used murder twice to create a capital offense," and his point of error numbered eight, which asserts the following: "The conviction violates due process because it was predicated on an indictment which permitted a double use of the alleged murder to bootstrap the offense into a capital murder." The majority opinion correctly sets out in its footnote 1 on page 492 of its opinion paragraphs one and two of the indictment.

The record reflects that the trial judge denied appellant's motion to quash the second paragraph of the indictment and also, over objection, instructed the jury on paragraph two of the indictment. The jury returned a general verdict finding appellant guilty of capital murder, without specifying under which paragraph of the indictment it found appellant guilty of capital murder. Thus, if the second paragraph of the indictment is insufficient to sustain a conviction for capital murder, neither appellant's conviction for capital murder nor his death sentence can stand.

Contrary to what the majority opinion might imply, the issues that appellant actually presents have never before been presented to or resolved by this Court.

It is perhaps true that because appellant's attorney on appeal combined in his brief his points of error for discussion, and relied upon multiple theories in support of his points of error, which is understandable given the fact that the issues he presents, or attempts to urge, as far as my research at this time reveals, have never before been presented to this Court for resolution, this causes the majority opinion of the Court not to understand the real arguments that he makes in his brief.

However, a clear reading of counsel's arguments makes it obvious to me that what counsel is actually contending is that, if the second paragraph of the indictment is defective in the sense that it will not support a conviction for capital murder under V.T.C.A., Penal Code, § 19.03(a)(2), and the evidence is sufficient to support a finding on that count of the indictment, then, because the jury returned a general verdict, which means in this instance that its verdict could have been based on either the first or second paragraph of the indictment, appellant's conviction for capital murder and death sentence should not be permitted to stand. Furthermore, it is also clear to me that counsel for appellant correctly contends that one should not be convicted of the offense of capital murder under § 19.03(a)(2) if the underlying offense has the element of murder which is the same murder that is alleged as the primary murder.

The majority opinion on page 495 of its opinion states that "The Texas capital murder statute narrows the class of death-eligible murderers." It is true that, as a matter of federal constitutional law, the narrowing of individuals who are subject to being put to death after being convicted for committing capital murder first occurs at the guilt stage of the trial and not at the punishment stage of the trial. However, that does not answer appellant's counsel's assertion that in this instance paragraph two of the indictment did not perform that narrowing function because when the jury was permitted to find appellant guilty of "burglary by murder", which was a first degree felony, it automatically found him guilty of capital murder.

The Texas capital murder scheme has been approved by the Supreme Court of the United States. See *Barefoot v. Estelle*, 463 U.S. 880, 896–97, 103 S.Ct. 3383, 3396, 77 L.Ed.2d 1090 (1983); *Jurek v. Texas*, 428 U.S. 262, 268–274, 96 S.Ct. 2950, 2954–57, 49 L.Ed.2d 929 (1976). Also see *Franklin v. Lynaugh*, —— U.S. ——, 108 S.Ct. 2320, 101 L.Ed.2d 155 (1988); *Thompson v. Lynaugh*, 821 F.2d 1054, 1059 (5th Cir.1987). In *Barefoot*, supra, the Supreme Court upheld V.T.C.A., Penal Code § 19.03(a)(2) after finding that it sufficiently narrows the class of persons who are subject to being convicted of capital murder, by requiring the pleader to allege and prove at least one independent aggravating specification

which causes the offense of murder to be elevated to capital murder.

In paragraph one of the indictment in this cause the State clearly satisfied its burden of pleading a capital murder offense under § 19.03(a)(2). However, in pleading the second paragraph the way it did, the State actually "spent" the murder that it needed to establish the primary offense of murder, and because the jury's verdict could have been based upon this paragraph of the indictment appellant's conviction for capital murder should not be permitted to stand.

What also causes the majority opinion to be extremely flawed is that it fails to comprehend that § 19.03(a)(2) only narrows the class of persons who subject themselves to being tried for capital murder. In Texas, *a further narrowing* of those persons who should actually be put to death occurs at the punishment stage of the trial when the jury is called upon to answer the special issues submitted to it pursuant to Art. 37.-071, supra.

I find that to really appreciate appellant's complaint about the second paragraph of the indictment it is first necessary to acknowledge and understand the well established principle of law that if a charging instrument contains multiple counts as to how the offense occurred, and one of the counts is defective, and the evidence tends to support both counts, and a general verdict is returned by the jury, a judgment of conviction must be set aside. See, for example, *Mc Clain v. State*, 153 Tex.Cr.R. 428, 220 S.W.2d 896, 897 (1949); *Martin v. State*, 142 Tex.Cr.R. 623, 156 S.W.2d 144 (1941). Also see *Stromberg v. California*, 283 U.S. 359, 51 S.Ct. 532, 75 L.Ed. 1117 (1931).

To further appreciate appellant's points of error and his attorney's arguments thereunder, it is necessary to understand and appreciate the fact that counsel is not claiming under these points of error that the evidence is insufficient to support an affirmative finding on either paragraph one or paragraph two of the indictment. Of course, had counsel only asserted under these points of error that the evidence was insufficient on one count of the indictment, and did not make such claim as to the other count of the indictment, then the issue would be controlled by this Court's decision of *Pinkerton v. State*, 660 S.W.2d 58 (Tex. Cr.App.1983). In *Pinkerton*, supra, the defendant did not claim on appeal that one of the counts of the indictment was defective; he only claimed on appeal that the evidence was insufficient to support a finding of guilt on one of the counts of the indictment. He did not challenge the sufficiency of the evidence as to the other count of the indictment. This Court rejected his contention after it found that the evidence that went to the other count of the indictment, about which the defendant made no complaint, was sufficient to sustain the jury's general verdict. Thus, it was unnecessary for this Court to determine the correctness of appellant's contention that the evidence was insufficient on the count about which he complained.

The indictment in this cause alleges in the first paragraph, for purposes of elevating the offense of murder to capital murder, that appellant murdered Faircloth in the course of committing the offense of *burglary of a habitation with intent to commit theft*, i.e., that appellant entered Faircloth's residence or habitation without Faircloth's effective consent, with intent to commit the offense of theft, and in the commission of the offense of burglary committed the murder of Faircloth. This clearly alleged both the offense of intentional murder, see V.T.C.A., Penal Code § 19.03(a)(2), and the underlying offense of burglary, see V.T.C.A., Penal Code § 30.02(a)(1), thus causing the offense of murder to be elevated to capital murder. Under § 19.03(a)(2) capital murder is committed when the individual intentionally murders another individual, see § 19.02(a)(1), in the course of committing or attempting to commit the offense of burglary. The State pled in the first paragraph of the indictment an intentional murder and also pled the elements of the offense of burglary pursuant to § 30.02(a)(1), which provides that an individual, without the effective consent of the owner, enters a habitation *with intent to commit a felony*

*or theft.* Murder, however, is not a necessary element of this kind of burglary offense.

The second paragraph of the indictment, however, alleges, for purposes of elevating the offense of murder to capital murder, that appellant murdered Faircloth *and that the murder occurred in the course of committing the offense of burglary by murder of Faircloth.* See V.T.C.A., Penal Code § 19.02(a)(1) and § 30.02(a)(2).[1]

Thus, in this instance, the State alleged in the second paragraph, as an element of the offense of burglary, the same murder that it alleged as the primary offense of murder. Thus, as to the second paragraph of the indictment, the allegations effectively allege that appellant committed the offense of capital murder of Faircloth by committing the offense of murder of Faircloth while in the course of committing the murder of Faircloth when he committed the burglary of Faircloth's residence.

Was the second paragraph of the indictment insufficient to allege capital murder, as appellant's counsel asserts; i.e., was it insufficient to establish capital murder because in alleging that appellant committed the underlying offense of burglary by murder the State "spent" the murder that it needed to establish that the murder was a § 19.03(a)(2), supra, or a capital murder offense?

The record reflects that the jury in this cause was instructed on both paragraphs of the indictment. In finding appellant guilty of capital murder, the jury returned a general verdict. See Art. 37.07, Sec. 1(a), V.A.C.C.P. The jury's verdict actually reads: "We, the jury, find the defendant guilty of capital murder, as charged in the indictment." Because the jury did not specify in its verdict, nor was it requested to do so, under which paragraph it found appellant guilty of capital murder, and because there is nothing in the record that might reflect or indicate on which paragraph the jury found appellant guilty of capital murder, it is impossible to state that

the jury did not base its verdict on paragraph two.

As I previously pointed out, this Court has long subscribed to the rule "that, where an information [or indictment] contains several counts, *one of which is fatally defective, and all counts are submitted to the jury*, and the evidence tends to support the offense charged in the defective count, and a general verdict is returned by the jury, a judgment of conviction will, under such circumstances, be set aside. (Citations omitted.) (Emphasis supplied.) *McClain v. State,* supra, 220 S.W.2d at 897. Also see *Martin,* supra, and *Stromberg,* supra. In this instance, the evidence is clearly sufficient to support a finding of guilt on both paragraphs of the indictment.

In responding to appellant's contention that the second paragraph of the indictment was insufficient to allege the offense of capital murder, and was thus defective to plead capital murder because it alleged the same murder twice, both as an element of the primary offense of murder and as an element of the underlying offense of burglary by murder, the State relies upon this Court's decision of *Pinkerton v. State,* supra. However, the issues presented in this cause and the issue that was presented in *Pinkerton,* supra, are, as I have previously pointed out, not the same. The State's reliance upon *Pinkerton,* supra, as authority is clearly misplaced.

In *Pinkerton,* supra, it was alleged in one paragraph of the indictment that the defendant committed the primary offense of murder of Sarah Donn Lawrence and alleged in the same paragraph the underlying offense of *robbery of Sarah Donn Lawrence.* In another paragraph of the indictment it was alleged that the defendant committed the offense of murder of Lawrence, and it was also alleged in the same paragraph the underlying offense of *burglary of a habitation owned by David Lawrence, her husband, with the intent to rape Sarah Donn Lawrence.* As easily seen, the State in that cause only alleged

---

1. As far as my research to date reveals, I have not yet found a single felony criminal offense,

other than burglary by murder, where murder is an essential element of that same offense.

one primary murder offense and alleged two different underlying offenses, neither of which alleged the same murder was an element thereof.

On appeal, the defendant in *Pinkerton*, supra, did not complain about the wording of the indictment. The defendant challenged the sufficiency of the evidence as to *the underlying robbery offense.* He did not assert that the evidence was insufficient on *the underlying burglary offense.* This Court rejected his contention, finding that, because the State had proved that the offense of murder occurred while in the course of committing the offense of *burglary* there was no necessity to make the determination whether the State also proved that the offense of murder was committed in the course of committing the offense of *robbery.* The issue here, however, is not whether the evidence is sufficient to sustain the allegations in the first paragraph of the indictment. The issue instead is whether the State may allege in one paragraph of the indictment the same murder in order to establish both the primary offense of murder and the underlying offense.

As its authority for overruling appellant's counsel's contention that the second paragraph of the indictment was insufficient or defective to correctly allege the offense of capital murder, the majority opinion relies heavily upon *Barnard v. State,* 730 S.W.2d 703 (Tex.Cr.App.1987). Its reliance upon *Barnard,* supra, however, is clearly misplaced.

In *Barnard,* supra, the indictment alleged that the defendant murdered *TUAN NGUYEN* by shooting him with a rifle and that such occurred in the course of committing the offense of robbery of *NGUYEN NGUYEN,* thus clearly alleging different victims. Contrary to the offense of burglary by murder, the element of murder is not an element of the offense of robbery. The defendant asserted on appeal that "The indictment is defective as a capital murder indictment in that it uses the act constituting the murder as an element that converted a theft into a robbery and then uses the robbery as the aggravating factor that con-

verted the murder into a capital murder." The indictment, however, did no such thing because it alleged that the defendant murdered one individual and that the murder occurred in the course of the defendant robbing another individual. The alleged underlying offense of robbery, however, did not have as an element thereof the same murder, and the State did not allege in the indictment that it was an element of that offense, as occurred here. Therefore, in *Barnard,* supra, the State never "spent" the primary murder when it alleged the underlying felony offense of robbery.

The State in this cause, in alleging in the underlying felony offense of burglary by murder the element of murder, which is the same murder that it alleged "was the murder committed in the course of committing the underlying offense", actually "spent" the murder that it needed to establish the offense of capital murder. The second paragraph of the indictment was clearly subject to appellant's motion to quash, because it did not allege the offense of capital murder; it only alleged the first degree felony offense of burglary by murder, and because it "spent" the murder in that cause, that element could not also be used to establish the offense of capital murder.

Although I cannot agree with the majority opinion that *Aguirre v. State,* 732 S.W.2d 320 (Tex.Cr.App.1987), is authority for rejecting appellant's attorney's theory that the doctrine of merger applies, I am compelled to agree with its conclusion that neither the Common Law doctrine of merger nor the felony murder statute, see V.T.C.A., Penal Code § 19.02(a)(3), is applicable to this cause. In this instance, there never was any merger of offenses; there was simply an attempt by the State to plead and use the same element in the underlying offense, which was murder, that was the same murder that it used to elevate the offense of murder to capital murder. However, "when the general verdict of the jury might rest upon an 'untenable' theory of the way the offense was committed ...", then a general verdict of guilt cannot be sustained." *Aguirre,* supra, at page 328 (Teague, J., dissenting opinion.)

The majority opinion appears to overrule appellant's points of error numbered seven and eight because it finds that the evidence is sufficient to sustain a capital murder conviction under either the first or the second paragraphs of the indictment. As previously pointed out, that, however, is not the issue that this Court should be resolving in this cause.

The majority opinion next relies upon *Lowenfield v. Phelps*, 484 U.S. 231, 108 S.Ct. 546, 98 L.Ed.2d 568 (1988), as authority to overrule appellant's above two points of error. Its reliance upon *Lowenfield*, supra, is also clearly misplaced.

In *Lowenfield*, supra, the defendant was charged in Louisiana by indictment with committing five counts of first degree murder. The indictment alleged that he murdered his girlfriend, her four year old daughter, the natural father of the daughter, his girlfriend's stepfather, and the stepfather's wife, in the same "criminal episode" or the same "criminal transaction." The indictment alleged, as an "aggravating specification", that in killing his victims the defendant *had the specific intent to kill or inflict great bodily injury upon more than one individual*, which under Louisiana law was a necessary element of the offense of first degree murder. Three times the jury found the defendant guilty of first degree murder. Under Louisiana law, he then became a member of that class of individuals eligible to receive the death penalty.

In deciding whether the defendant Lowenfield should live or die, Louisiana law, contrary to Texas law, requires the jury to find in the affirmative at least one of ten statutory aggravating circumstances. The jury in that cause found in the affirmative two of the ten statutory aggravating circumstances. Under Louisiana law, although it was necessary for the jury to find the aggravating element that caused the offense of murder to be aggravated, in order for the jury to convict the defendant of the offense of first degree murder, the jury was not bound by that finding at the punishment stage of the trial when it came to making the decision whether any aggra-

vating circumstances existed. The jury found it was an aggravating circumstance and the Louisiana Supreme Court found that the evidence was sufficient to sustain that finding. This finding actually comports with our law that provides that in answering the submitted special issues the jury may consider all of the evidence adduced at the guilt stage of the trial. See, for example, *O'Bryan v. State*, 591 S.W.2d 464, 480 (Tex.Cr.App.1979).

On direct appeal to the Louisiana Supreme Court the defendant Lowenfield did not claim that his indictment was faulty or defective, nor did he claim that the evidence was insufficient to sustain the jury's verdict that he was three times guilty of first degree murder. He asserted that his sentence of death could not validly rest upon an aggravating circumstance that was also a necessary element of the alleged offenses of first degree murder. The Louisiana Supreme Court considered and rejected this contention under its supervisory powers in death penalty cases, i.e., "[That] court [unlike the Texas Court of Criminal Appeals] reviews every death sentence to determine if it is excessive." *State v. Lowenfield*, 495 So.2d 1245, 1256 (La.1985). In making the determination whether the death penalty was excessive, according to its Supreme Court Rule 28, § 1, the Louisiana Supreme Court found that the evidence was insufficient to support the jury's finding on the non-element aggravating circumstance, but also found that the evidence was sufficient to sustain the jury's finding on the aggravating circumstance that was alleged as an element of the offense. However, based on past case law, the Court held that this finding would not invalidate the other non-element aggravating circumstance unless it found that this caused "an arbitrary factor to be introduced into the proceedings." The Court then considered whether evidence of an extraneous conviction and extraneous offenses, which apparently were the basis of the non-element aggravating circumstance, "introduced an arbitrary factor into these proceedings." It found, as to the extraneous offenses, that, given the facts of the case, such had no impact on the aggravat-

ing circumstance that the Court found was supported by the evidence. As to the extraneous conviction, the Court found that, because the defendant had agreed to this historical fact at the guilt stage of the trial, and because such was admissible at the punishment stage of the trial, it had no impact on the jury's affirmative finding on the aggravating circumstance that the Court had sustained.

The United States District Court rejected the defendant Lowenfield's same contention and denied him any relief.

The defendant Lowenfield appealed to the Fifth Circuit Court of Appeals. A panel of the Fifth Circuit Court of Appeals rejected Lowenfield's contention that "this aggravating circumstance [the same one that was an element of the alleged primary offenses of first degree murder] fails to narrow the class of persons eligible for the death penalty because it does nothing more than duplicate an element of the crime." *Lowenfield v. Phelps*, 817 F.2d 285, 288–289 (5th Cir.1987). In rejecting the defendant's contention, the panel opinion states the following:

> Petitioner relies primarily on *Collins v. Lockhart*, 754 F.2d 258 (8th Cir.), cert. denied, 474 U.S. 1013, 106 S.Ct. 546, 88 L.Ed.2d 475 (1985). In *Collins*, the Eighth Circuit concluded that there is 'no escape from the conclusion that an aggravating circumstance which merely repeats an element of the underlying crime cannot perform the narrowing function [required by the Supreme Court.' *Id.* at 264. But, we expressly rejected this analysis in *Wingo v. Blackburn*, 783 F.2d 1046, 1051 (5th Cir.1986), where we stated 'we fail to see why aggravating circumstances narrow the sentencing discretion any less by being made a constituent element of the crime. The State of Louisiana is entitled to authorize capital punishment for persons guilty of these aggravated acts where the jury does not

find that mitigating circumstances justify less than the death penalty.' See also *Evans v. Thigpen*, 809 F.2d 239 (5th Cir. 1987); *Wilson v. Butlers*, 813 F.2d 664 (5th Cir.1987). Thus, based upon clear precedent from this circuit, we reject petitioner's arguments presented in this claim. (289).

The Supreme Court of the United States granted certiorari to the Louisiana Supreme Court in *Lowenfield v. Phelps*, 484 U.S. 231, 108 S.Ct. 546, 98 L.Ed.2d 568 (1988), and held that "the Louisiana scheme narrows the class of death-eligible murderers and then at the sentencing phase allows for the consideration of mitigating circumstances and the exercise of discretion. The Constitution requires no more." [2]

One main distinction between the issues presented in this cause and the issue that was presented in *Lowenfield*, supra, is that the issues in this cause pertain to the guilt stage of the trial whereas the issue there was restricted to the use of an element of the primary offense as an aggravating circumstance at the punishment stage of the trial. The issue here, however, only concerns the guilt stage of the trial, and is whether the State can plead the same murder both to establish the primary offense of murder and the underlying offense of burglary by murder. The issues are obviously poles apart.

Another reason that the majority opinion of this Court is extremely flawed is because it has gotten "aggravating specifications" mixed up with "aggravating circumstances." Other courts of this Nation have also made this same mistake, however. "Of greater concern is the blurring, by the majority, beyond recognition of the difference between 'aggravating specifications' and 'aggravating circumstances'...." *State v. Davis*, 38 Ohio St.3d 361, 528 N.E.2d 925 (1988) (Douglas, J., dissenting opinion).

---

**2.** The use of the term "death-eligible murderers" in that context, although technically correct, is actually misleading. It appears to me that a defendant who commits the offense of capital murder does not technically become "death eligible" until after the jury has found him guilty of capital murder, which, if that occurs, he then becomes a member of that class of persons found guilty of first degree murder who is "subject to" having the death sentence imposed by the trial court.

Texas, however, does not use the weighing of aggravating circumstances against mitigating circumstances test in deciding whether a defendant convicted of capital murder must live or die. In Texas, whether a defendant might live or die after he has been convicted of capital murder first depends upon whether the jury answers all of the submitted special issues in the affirmative.

Under Texas law, before an individual may be *charged* with committing capital murder, as applied here, he must commit the offense of murder in the course of committing or attempting to commit the offense of burglary. The statutory underlying offense of burglary thus represents an "aggravating specification" of the offense of capital murder, which, if both the offense of murder and the underlying offense are proved beyond a reasonable doubt, causes the offense of murder to be elevated to capital murder. Under § 19.03(a)(2), the offense of "burglary by murder" is *not* listed as one of the underlying offenses that can be used to elevate the offense of murder to capital murder.

History teaches us that, after the Supreme Court of the United States struck down the Texas capital murder scheme in *Branch v. Texas,* decided with *Furman v. Georgia,* 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972), the Texas Legislature thereafter narrowed the scope of its laws relating to capital crimes and the punishment therefor. Presently, V.T.C.A., Penal Code § 19.03 narrows the class of persons who may be charged, tried, and convicted of capital murder. Even where the defendant is found guilty of capital murder, this does not mean that he will die. Whether he will live or die in that instance is first determined by the answers that the jury gives to the special issues submitted pursuant to Art. 37.071, V.A.C.C.P. Thus, in Texas, we have a narrowing and then a further narrowing. Art. 37.071, surpa, commences where § 19.03 ends. Art. 37.-071, supra, expressly provides that it is only when the jury answers the submitted special issues in the affirmative that the trial court must impose the death sentence.

I find nothing in the Supreme Court's decision of *Lowenfield,* supra, that might reflect or indicate that that Court deviated or intends to deviate from its past holdings that, in order for a state capital murder statute to pass federal constitutional muster, it must "genuinely narrow the class of persons eligible for the death penalty and must reasonably justify the imposition of a more severe sentence on the defendant compared to others found guilty of murder", *Zant v. Stephens,* 462 U.S. 862, 877, 103 S.Ct. 2733, 2742, 77 L.Ed.2d 235 (1983), and that "[I]t is *constitutionally* required that the sentencing authority have information sufficient to enable it to consider the character and individual circumstances of a defendant prior to imposition of the death sentence." *Gregg v. Georgia,* 428 U.S. 153, at 189, n. 38, 96 S.Ct. 2909, at 2933, n. 38, 49 L.Ed.2d 859 (1976) (emphasis added.) Also see *Woodson v. North Carolina,* 428 U.S. 280, 304, 96 S.Ct. 2978, 2991, 49 L.Ed.2d 944 (1976); *Sumner v. Schuman,* 483 U.S. 66, 107 S.Ct. 2716, 2720, 97 L.Ed.2d 56 (1987); *Lockett v. Ohio,* 438 U.S. 586, 604, 98 S.Ct. 2954, 2965, 57 L.Ed.2d 973 (1978); *Hitchcock v. Dugger,* 481 U.S. 393, 107 S.Ct. 1821, 95 L.Ed.2d 347 (1987); *Eddings v. Oklahoma,* 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982); *Franklin v. Lynaugh,* —— U.S. ——, 108 S.Ct. 2320, 101 L.Ed.2d 155 (1988).

The Supreme Court has held that this narrowing function may constitutionally be provided in either of two ways: the legislature may broadly define capital offenses and provide for narrowing by jury findings of aggravating circumstances at the penalty stage of the trial, or the legislature may itself narrow the definition of capital offenses so that the jury finding at the guilt stage of the trial responds to this concern. *Jurek v. Texas,* supra. In *Lowenfield,* supra, the Supreme Court held that the duplicative nature of the statutory aggravating specification did not render that defendant's sentence of death infirm, since the constitutionally mandated narrowing function was performed at the guilt stage of the trial and the federal constitution does not require an additional aggravating circumstance finding at the penalty phase.

That, however, is not the issue in this cause, mainly because the issues that appellant presents in this cause do not concern the punishment stage of his trial; they only concern the guilt stage of the trial. The main question here is whether the State may use the element of murder in the underlying offense, and then use that same murder to establish the alleged primary offense of murder. This is "double dipping" and not the "duplication" which occurred in *Lowenfield,* supra.

Furthermore, in *Batten v. State,* 533 S.W.2d 788, 793 (Tex.Cr.App.1976), this Court ruled that "in the wake of *Furman* the Legislature has adopted a 'category of cases' view and has adopted a mandatory procedure to be followed in capital cases where the extreme penalties of death or life imprisonment are involved...."

It is clear to me, if no one else, that where the underlying offense has the element of murder the Legislature did not intend that that same murder could be used to establish the primary offense of murder, for fear that it would run afoul of what the Supreme Court had stated and held in *Furman,* supra. E.g., *Collins v. Lockhart,* supra.

Statutory crimes are comprised of elements. A crime is identified by the sum of its elements. When the statutory definition of a crime contains two or more identical elements, the definition is redundant; all but one of the identical elements can be deleted without changing the meaning of the statute. Redundancy is a "useless thing." It is a settled rule of statutory construction not to interpret laws in such a way as to render an act of the legislature useless. Of course, this Court always presumes that, in enacting legislation, the legislature did not do a "useless thing." E.g., *Heckert v. State,* 612 S.W.2d 549, 553 (Tex.Cr.App.1981).

Therefore, when confronted with a statute comprised of elements, two or more of which can be construed either as different or as identical, this Court should generally construe the elements as different. To do otherwise would assume that the legislature did a "useless thing", i.e., drafted a redundant statute. To avoid such a construction it should always be assumed, in the absence of some compelling reason to the contrary, that all statutory crimes are comprised of *unique* elements.

In this instance, unless the two murder elements are construed to be different, the statutory offense of capital murder is a redundancy in this variation and produces two anomalies which should be disfavored by sound rules of statutory construction: (1) that the offense of capital murder is sometimes identical with the underlying offense of burglary, and (2) that murder committed during the course of committing criminal trespass is always a capital offense, which appears to be what the majority opinion holds. See page 9 of its slip opinion. However, in the absence of some compelling reason, such as a clear expression of legislative intent, it is unwise to construe the pertinent statutes in this way, not even when one has the "muscle" to do so.

Lastly, I find a great deal of merit in appellant's counsel's theory that what occurred in this cause falls under this Court's principle of law that where the State uses a defendant's prior conviction to establish an essential element of the primary offense, the State is thereafter barred from using that same conviction to enhance the punishment for the primary offense. See, for example, *Wisdom v. State,* 708 S.W.2d 840, 845 (Tex.Cr.App.1986); *Ramirez v. State,* 527 S.W.2d 542 (Tex.Cr.App.1975); and *Fletcher v. State,* 169 Tex.Cr.R. 506, 335 S.W.2d 613 (Tex.Cr.App.1960). Although in this instance the State did not allege in the second paragraph a prior conviction to enhance punishment, the fact of the matter is that in principle it alleged the equivalent; i.e., in alleging the underlying offense of burglary by murder, it used the same element of murder to elevate the offense of murder to capital murder.

In conclusion, I am compelled to repeat what Justice Blackmun stated in the dissenting opinion that he filed in *Barclay v. Florida,* 463 U.S. 939, 103 S.Ct. 3418, 3446, 77 L.Ed.2d 1134 (1983):

The end does not justify the means even in what may be deemed to be a 'deserving' capital punishment situation.

The majority opinion's efforts to engraft an exception onto § 19.03(a)(2), and permit the State to use the same murder element in the underlying offense that is in the primary offense, should cause this Court's members to be concerned about the validity of Texas' capital murder statute, especially given the Fifth Circuit's recent expressions of concern about its validity that it announced in its panel opinion of *Penry v. Lynaugh,* 832 F.2d 915 (5th Cir.1987), cert. granted in part —— U.S. ——, 108 S.Ct. 2896, 101 L.Ed.2d 930 (1988). It is majority opinions like the one in this cause that may someday cause the Supreme Court to once again hold that this State's capital murder statute is, as a matter of federal constitutional law, unconstitutional.

For all of the reasons that I have given, I respectfully dissent to the manner in which the majority opinion overrules appellant's points of error numbered seven and eight.