PD-1407-15
COURT OF CRIMINAL APPEALS
AUSTIN, TEXAS
Transmitted 11/2/2015 4:55:35 PM
Accepted 11/3/2015 2:17:27 PM
ABEL ACOSTA
CLERK

**No. PD-_____**

**IN THE
COURT OF CRIMINAL APPEALS
FOR THE
STATE OF TEXAS**

**HERBERT GARDNER
Appellant**

**V.**

**THE STATE OF TEXAS
Appellee**

_____

FROM THE COURT OF APPEALS FOR THE
FOURTEENTH JUDICIAL DISTRICT OF TEXAS
HOUSTON, TEXAS
NO. 14-14-00690-CR

_____

APPEAL FROM THE 180TH JUDICIAL DISTRICT
HARRIS COUNTY, TEXAS
TRIAL COURT CAUSE NO. 1372136

**APPELLANT'S PETITION FOR DISCRETIONARY REVIEW**

FILED IN
COURT OF CRIMINAL APPEALS

November 3, 2015

ABEL ACOSTA, CLERK

PATTI SEDITA
State Bar No. 00787484
One Sugar Creek Center Blvd., #1045
Sugar Land, TX 77478
281.313.4225
Counsel for appellant on appeal

ORAL ARGUMENT REQUESTED

## STATEMENT REGARDING ORAL ARGUMENT

Pursuant to **TEX. R. APP. PROC.** 75, appellant requests oral argument in this case. Appellant believes oral argument would be helpful in deciding the issues in the case because it would allow for an expanded discussion of the factual differences between various conflicting cases and how those factual differences impact the legal standards and their application.

## CERTIFICATE OF INTERESTED PARTIES

In order that the members of this Court may determine disqualification and recusal Appellant certifies that the following is a complete list of the parties, attorneys, and other persons with an interest in the outcome of this lawsuit:

| | |
|---|---|
| Honorable Terry Flenniken | *Presiding Judge in 180th District Court* |
| Hattie Sewell Mason | *Defense counsel at trial* |
| Vivian King | *Defense counsel at trial* |
| Patti Sedita | *Defense counsel on appeal* |
| Mary McFaden | *Assistant District Attorney at trial* |
| Kathryn Kahle | *Assistant District Attorney at trial* |
| Allen Curry | *Assistant District Attorney on appeal* |
| Herbert Gardner | *Appellant* |

# SUBJECT INDEX

*Statement regarding oral argument*...................................................................... *ii*

*Identification of the parties* ........................................................................... *ii*

*Preliminary statement*..................................................................................... *1*

*Statement of the facts*.................................................................................... *2*

*Appellant's issue for review*........................................................................... *9*

*Summary of reasons for review*....................................................................... *9*

*Reasons for review* ....................................................................................... *10*

*Conclusion and prayer for relief*..................................................................... *14*

*Certificate of service* ................................................................................... *14*

*Statement of word count* ............................................................................... *15*

**TABLE OF AUTHORITIES**

*Cases*

***Fearance v. State***, 771 S.W.2d 486 (Tex. Crim. App. 1988)........................................... 11

***Furman v. Georgia*** 408 U.S. 23892 S.Ct. 272633 L.Ed.2d 346 (1972)........................ 11

***Jackson v. Virginia***, 443 U.S. 307, 318, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979)........... 10

***Jurek v. State***, 522 S.W.2d 934 (Tex. Crim. App. 1975)................................................ 11

***Jurek v. Texas***, 428 U.S. 262, 96 S.Ct. 2950,   49 L.Ed.2d 929 (1976)........................ 12

***Salinas v. State***, 163 S.W.3d 734, 737 (Tex. Crim. App. 2005) .................................... 10

*Rules*

**TEX. R. APP. PROC.** 66.3 ........................................................................................ 9

**TEX. R. APP. PROC.** 75 ........................................................................................ ii

## STATEMENT OF THE CASE

Appellant was charged by indictment in cause number 1372136 with the offense of capital murder alleged to have been committed on December 23, 2012 (CR: p. 7). On August 11, 2014 the case proceeded to trial by jury. (CR: p. 344). On August 15, 2014 the jury returned a verdict of guilty of the offense of capital murder. (CR: p. 372). On August 15, 2014, as required by statute, the trial judge assessed Appellant's punishment at confinement for life without parole in the Texas Department of Criminal Justice, Institutional Division and signed the judgment and sentence that same day. (CR: p. 374). On that same day, Appellant gave notice of appeal. (CR: p. 376).

On September 17, 2015, the Fourteenth Court heard oral argument in this matter. On October 1, 2015, the Fourteenth Court of Appeals at Houston issued a published opinion affirming Appellant's conviction. (See exhibit A).

## STATEMENT OF THE FACTS

On December 23, 2012, Herbert Gardner was arrested and subsequently charged with capital murder following the death of his girlfriend, Connie Bowie. (RR Vol. 3, p. 52). Mr. Gardner had been living with Ms. Bowie at 4827 Brisbane Drive in Houston, Texas, for four years up until he temporarily moved into a motel room on November 2, 2012. (RR Vol. 3, p. 54; Vol. 5, p. 168).

Prior to Mr. Gardner being charged with capital murder, there were two incidents where police were called to their residence in order to mediate arguments. On March 24, 2012, Mr. Gardner and Ms. Bowie's neighbor, Lawanda Roberts, called the police after Ms. Bowie requested to be let inside her home and appeared to have a leg injury. (RR Vol. 3, p. 266-270). Mr. Gardner also went to the neighbor's to ask that Ms. Bowie come home. (RR Vol. 3, p. 268). Ms. Roberts testified that both Mr. Gardner and Ms. Bowie appeared to be in an excited state. (RR Vol. 3, p. 266-271). No arrest was made that night and Ms. Bowie returned to her residence early the next morning. (RR Vol. 3, p. 277; Vol. 4, p. 46-47) Ms. Roberts took Ms. Bowie to a medical clinic in Pearland two days later but Ms. Roberts was unaware if Ms. Bowie received treatment for her leg injury. (RR Vol. 3, p. 279). Ms. Roberts was also unaware of how Ms. Bowie received her injury. (RR Vol. 3, p. 278). According to testimony by Jorge Castillo, a counselor for the Houston Police Department Family Violence Unit, Ms. Bowie sought counseling

and information on a protective order should charges ever be filed. (RR Vol. 4, p. 14-15; 30). Additionally, Mr. Castillo took photos of Ms. Bowie's leg injuries. (RR Vol. 4, p. 16). Mr. Castillo also testified that Ms. Bowie did not reveal to him that she started the altercation with Mr. Gardner by throwing a bottle at him as she previously stated to the police. (RR Vol. 4, p. 41-42). In filing paperwork with Mr. Castillo, Ms. Bowie listed Mr. Gardner's address as 4827 Brisbane Drive. (RR Vol. 4, p. 45).

On November 2, 2012, police were called to 4827 Brisbane because Ms. Bowie and Mr. Gardner were arguing outside their residence. (RR Vol. 4, p. 61-65). Ms. Bowie requested that Mr. Gardner leave their home, so police arrested Mr. Gardner on the charge of public intoxication. (RR Vol. 4, p. 65-66). There was no allegation or evidence of domestic violence. (RR Vol. 4, p. 76-77) During trial, the arresting officer, J.W. James, was shown the deed for 4827 Brisbane Drive to which he testified that Ms. Bowie's name was listed on it. (RR Vol. 4, p. 70-71). Officer James was also shown records from Sun Suites Motel, by which he testified that Mr. Gardner was listed as renting a hotel room beginning November 2, 2012. (RR Vol. 4, p. 72-73). However, Officer James listed Mr. Gardner's address as 4827 Brisbane Drive (according to his driver's license). (RR Vol. 4, p. 75).

Following a night of drinking, doing cocaine, and smoking marijuana with his friend Terrell "Nu-Nu" Lewis, Mr. Gardner returned to his residence at 4827 Brisbane Drive in the early morning hours of December 23, 2012. (RR Vol. 5, p. 164; 172). Mr. Lewis testified that Mr. Gardner backed his vehicle into the driveway and then walked to the home's front door. (RR Vol. 5, p. 174-175). According to Mr. Lewis' testimony, Mr. Gardner was "banging" on the front door until Ms. Bowie answered. (RR Vol. 5, p. 175). Mr. Lewis then heard the voices of Ms. Bowie and Mr. Gardner become agitated and soon thereafter heard breaking glass. (RR Vol. 5, p. 176; 179). Mr. Lewis quickly moved into Mr. Gardner's driver seat and drove away from the scene. (RR Vol. 5, p. 179-184). Driving in a vehicle with a multitude of Mr. Gardner's personal belongings in it, Mr. Lewis used Mr. Gardner's cell phone to dial 911 and reported a domestic disturbance. (RR Vol. 5, p. 166-167; 184). Mr. Lewis subsequently "misplaced" nearly all of Mr. Gardner's personal belongings in the car— including the vehicle's tires— before trial (RR Vol. 5, p. 231-232). Additional 911 calls were made shortly after Mr. Lewis' call reporting gunshots, and Officer Anthony Thomas was quickly dispatched to the area. (RR Vol. 3, p. 74). While Officer Thomas was driving on Brisbane shots were fired at his patrol vehicle (RR Vol. 3, p. 83-89). Officer Thomas quickly drove away from the area and called for backup (RR Vol. 3, p. 90-92). Nothing in the record indicates that Officer Thomas was injured in the

incident. A man, later identified as Mr. Gardner, then left 4827 Brisbane Drive in a red Dodge Nitro just as other officers were arriving at the residence and they gave chase (RR Vol. 3, p. 92; 142-145). During the course of the pursuit police fired at Mr. Gardner because it appeared that he was holding a shotgun in a position that suggested he may fire at officers pursuing him. (RR Vol. 3, p. 121) Mr. Gardner subsequently wrecked the vehicle into another residence and was found in a nearby backyard holding a shotgun (RR Vol. 3, p. 123; 132-134; 147-148). Mr. Gardner and the shotgun were found covered in blood (RR Vol. 3, p. 133-134; 148-149).

After finding Mr. Gardner nearly passed out in a back yard he was transported by ambulance to Ben Taub hospital. (RR Vol. 3, p. 132; 236-238). Houston Police Officer Jarvis Robin accompanied Mr. Gardner in the ambulance. (RR Vol. 3, p. 238). Over the objection of Mr. Gardner's counsel, Officer Robin testified at trial that while riding in the ambulance, prior to being Mirandized, and not being recorded, Mr. Gardner allegedly stated, "I should not have shot her. I'm going to hell." (RR Vol. 3, p. 238; 242; 247).

Officer Jamie Exley of the Houston Police Department Crime Scene Unit arrived at 5351 Glen Rio, the area of the end of the pursuit. (RR Vol. 3, p. 192). Officer Exley made note of a blood trail from the vehicle crash site to the location where Mr. Gardner was found and collected various ballistic evidence. (RR Vol. 3, p. 196-225).

Officer R.J. Standfield of the Houston Police Department arrived at 4827 Brisbane Drive shortly after Mr. Gardner left and observed broken glass on the front porch, broken glass in the front living room, blood trails, pools of blood throughout the house, and the body of Ms. Bowie on the front porch. (RR Vol. 4, p. 97-99). Officer Standfield also observed bloody footprints throughout the house. (RR Vol. 4, p. 109).

Officer Daniel Nunez of the Houston Police Department Crime Analysis Division arrived at 4827 Brisbane Drive later that morning. (RR Vol. 4, p. 132). Officer Nunez identified, photographed, and collected various evidence throughout the house, including male clothing. (RR Vol. 4, p. 144-219; 225). Officer Nunez also photographed Ms. Bowie's body and noted that her wounds indicated that she fell or was pushed out the front window. (RR Vol. 4, p. 222). Officer James Dueler, also with the Crime Analysis Division, diagramed the inside of the residence and collected blood swabs. (RR Vol. 4, p. 232).

Sergeant Richard Rodriguez, a homicide investigator for the Houston Police Department, subsequently arrived at 4827 Brisbane Drive and attempted to interview possible witnesses. (RR Vol. 5, p. 4-12). Additionally, he observed the broken front window and testified that there was a possible forced entry. (RR Vol. 5, p. 75). Through the course of his investigation he was led to Mr. Lewis, who cooperated fully. (RR Vol. 5, p. 37-39). Through Mr. Lewis, Sergeant Rodriguez

was able to recover personal documents, which listed Mr. Gardner's address as 15015 West Airport Boulevard, Sugar Land, Texas on November 6, 2012. (RR Vol. 5, p. 69). Sergeant Rodriguez did not go to this Sugar Land address in their investigation. (RR Vol. 5, p. 86). The hotel Mr. Gardner was staying at prior to December 22, 2012, was found completely empty. (RR Vol. 5, p. 89). Sergeant Rodriguez testified that while attempting to interview Mr. Gardner, he observed that Mr. Gardner had two large lacerations on his arm. (RR Vol. 5, p. 32).

At trial, Ms. Donna Eudaley, a firearms examiner for the Houston Police Department Crime Laboratory, testified that all shotgun shells located at or near 4827 Brisbane Drive were fired from the weapon that was found with Mr. Gardner. (RR Vol. 5, p. 275-304).

Ms. Amanda Duda, a DNA analyst at Bodie Technology, testified that blood swabs taken from the shotgun contained the same male DNA profile. (RR Vol. 5, p. 95; 100-103).

Jennifer Clay, a DNA analyst at the Houston Forensic Science Center, testified that all but one tested blood swab taken from 4827 Brisbane Drive and all samples taken from the shotgun could not eliminate Mr. Gardner as a major contributor to the samples collected. (RR Vol. 5, p. 106-153). Connie Bowie could not be eliminated as a major contributor to one blood swab collected. (RR Vol. 5, p. 141-142).

Dr. Merrell Hines testified that, according to autopsy reports prepared by another medical examiner who actually preformed the autopsy on Ms. Bowie, it appeared the cause of death was a shotgun wound to the head and torso. (RR Vol. 5 p. 252; 273).

## GROUND FOR REVIEW

*Whether evidence is insufficient to support the jury's verdict that Appellant committed the offense of capital murder as there was insufficient proof of the predicate crime of burglary because this Court's decision in **Fearance** and its progeny has been misinterpreted and should be revisited.*

## SUMMARY OF REASONS FOR REVIEW

Review is proper pursuant to **TEX. R. APP. PROC.** 66.3. The court below correctly applied decisions of this Honorable Court. However, this Court should revisit the **Fearance** decision and its progeny. The continued affirmation of the misinterpreted holding in **Fearance** is an unlawful expansion of the death eligibility for murder. This is an important question of state and federal law that should be closely examined by the Court of Criminal Appeals.

## REASONS FOR REVIEW

When conducting a sufficiency review, an appellate court should view all evidence in the light most favorable to the verdict and determine whether any rational trier of fact could have found the essential elements of a crime beyond a reasonable doubt. ***Salinas v. State***, 163 S.W.3d 734, 737 (Tex. Crim. App. 2005); ***Jackson v. Virginia***, 443 U.S. 307, 318 (1979).

The evidence in this case did not meet legal sufficiency standards. In this case, the State was obligated to present evidence that Appellant (1) intentionally killed Connie Bowie, (2) in the course of committing the crime of burglary which requires proof that Appellant (3) entered the residence without her consent, and (4) with the intent to commit or committing (5) (a) theft or (b) assault or (c) a felony. Burglary requires more than unlawful entry; it requires the commission or attempt to commit an assault, theft or other felony while in the course of the unlawful entry.

There is nothing in the record to suggest or support that Appellant had the intent to commit a theft or intended to commit an assault prior to his entry into his home. There is nothing in the record to suggest or support that Appellant committed a theft after he entered his home or committed an assault once inside. There is nothing in the record to suggest or support that Appellant intended to commit a felony when he entered his home.

There *is* evidence that Appellant committed one felony while inside his house; the murder of Connie Bowie. However, the state should not be able to turn murder into a capital murder by proving that the Appellant committed murder while in the course of committing burglary by murder. This is illogical. Such a statutory construction allows the state to "double dip", using one act or offense two times in the same charge. The court of appeals upheld Appellant's conviction citing the holdings by this Court in *Fearance v. State*, 771 S.W.2d 486 (Tex. Crim. App. 1988), and its progeny.

Appellant contends this Court should grant review because a reassessment is needed of the line of case law originating from *Fearance*. This case has been subsequently cited to support a conclusion for which the original opinion did not stand. This Court should correct this misinterpretation of this body of capital murder case law and prevent the continued expansion of capital eligible homicides.

In 1972, in response to the United States Supreme Court holding in *Furman v. Georgia* 408 U.S. 23892 S.Ct. 272633 L.Ed.2d 346 (1972), the Texas Legislature enacted a new statutory scheme that narrowed the scope of its laws relating to capital crimes. In *Jurek v. State*, 522 S.W.2d 934 (Tex. Crim. App. 1975) the Texas Court of Criminal Appeals upheld the constitutionality of the new capital murder statute and stated:

First, Article 1257, *supra,* [now Section 19.03, Texas Penal Code] limits the circumstances under which the State may seek the death penalty to a small group of narrowly defined and particularly brutal offenses. This insures that the death penalty will be only imposed for the most serious crimes. It also insures that the death penalty will only be imposed for the same type of offenses, which occur under the same types of circumstances.

*Id.* at 939. *See also **Jurek v. Texas***, 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976) (upholding the constitutionality of the Texas capital murder statute).

The body of case law stemming from ***Fearnace*** represent a misreading of that case's original holding. ***Fearance*** doesn't stand for the proposition for which it, and the cases that follow, have been continually cited.

The Fourteenth Court of Appeals affirmed Appellant's conviction following a strict adherence to the body of case law stemming from ***Fearance.*** The following chart diagrams the "family tree" of ***Fearance*** case law. The Fourteenth Court of Appeals was constrained by this body of case law that has stretched the death eligibility of murder cases beyond a place contemplated by ***Furman*** or ***Jurek***. This Court should undo the damage done by this trend before this area of capital murder jurisprudence is stretched beyond recognition and United States Supreme Court limitations become meaningless.



## CONCLUSION AND PRAYER FOR RELIEF

**FOR THESE REASONS**, Appellant prays this Court Appellants respectfully pray that this Honorable Court grant their Petition for Discretionary Review, set this case for oral argument, and reverse the decision of the court of appeals, entering a judgment of acquittal on appeal.

Respectfully submitted,

PATTI SEDITA
State Bar No. 00787484
One Sugar Creek Center Blvd., #1045
Sugar Land, TX 77478
281.313.4225
Counsel for appellant

## CERTIFICATE OF SERVICE

I certify that I delivered a copy of the Appellant's Petition for Discretionary Review to the Harris County District Attorney's Office, Appellate division, via *efiletex.gov*, on this the 30th of October 2015.

Patti Sedita

## STATEMENT OF WORD COUNT

In compliance Texas Rules of Appellate Procedure, the number of words in this petition, excluding any parts exempted by Tex. R. App. P. 9.4(i)(1). as counted by the word processing program used is 2382.

_____
Patti Sedita

**Exhibit A**

Affirmed and Opinion filed October 1, 2015.



**In The**

# Fourteenth Court of Appeals

_____

NO. 14-14-00690-CR

_____

**HERBERT GARFIELD GARDNER,**

**Appellant V.**

**THE STATE OF TEXAS, Appellee**

**On Appeal from the 180th District
Court Harris County, Texas
Trial Court Cause No. 1372136**

# O P I N I O N

Appellant, Herbert Garfield Gardner, appeals from his conviction for capital murder. A jury found appellant guilty, and the trial court sentenced him to mandatory life in prison. While appellant concedes that he intentionally murdered the complainant, he contends in two issues that the evidence was insufficient to prove that he did so in the course of committing a burglary, the aggravating factor that elevated the murder to a capital offense.  We affirm.

## *Background*

On December 23, 2012, appellant shot and murdered complainant Connie Bowie inside her home in Houston, Texas. It was undisputed at trial that Bowie owned and lived in the home at the time of the murder and that previous to the murder, appellant was in a romantic relationship with Bowie and had lived with her at the property for around four years.

Officer J.W. James of the Houston Police Department testified that on November 2, 2012, he responded to a disturbance call at the home to find appellant and Bowie arguing in the street. James reported that Bowie appeared fearful and had asked appellant to leave. Appellant was then arrested for public intoxication. Records obtained from the Sun Suites Hotel and admitted into evidence revealed that appellant began renting a room at the hotel on the same day as the disturbance, November 2, 2012, and continued to rent a room there until December 23, 2012, the day before the murder.[1]

Terrell Lewis testified that he was a friend of appellant's prior to the murder and went out drinking and taking drugs with appellant on the evening of December 22, 2012 until the early morning hours of December 23. According to Lewis, appellant had several suitcases and bags in his car at the time and explained that he had "been staying in a room." When Lewis and appellant left a club for appellant to drive Lewis home, appellant instead drove to Bowie's home and backed his car into the driveway.[2] Appellant exited but left the vehicle running. He then approached the home and began banging on the front door. At that point, Lewis could hear appellant and Bowie talking through the door. Appellant sounded

---

[1] The murder occurred in the early morning hours of December 23, 2012.

[2] Lewis identified the house in a photograph that was otherwise established to be of the home.

2

angry. Bowie told him "[j]ust come back, come back," "[c]ome back. I'm sleeping," and "[c]ome back in the morning, we'll talk." Lewis then heard a window break, and when he turned to look at the house again, he could no longer see appellant. Lewis called to appellant "[w]hat . . . you doing?" and moved to the driver's side of the car. When appellant did not come out of the house after a few seconds, Lewis drove to the end of the street, called 9-1-1, and reported "domestic violence."

Officer Anthony Thomas testified that on the morning of December 23, 2012, he was dispatched to the home for an assault in progress. As he approached, he heard a gunshot and his rear window "exploded." Thomas then saw a man standing about ten feet away pointing a shotgun at him.[3] The man fired twice more as Thomas sped away. After reporting that shots had been fired, Thomas returned to the area and saw the man with the shotgun enter a red Dodge Nitro and drive away. Thomas and two other police vehicles gave chase, soon joined by several others. The Nitro eventually crashed into a house, and appellant was identified as the driver and transported by ambulance to the hospital. An officer described appellant at that point as having blood on him "from head to toe." Officer Jarvis Robins rode with appellant in the ambulance and reported that on the ride, appellant said, "I should not have shot her," and "I'm going to hell."

Officer Rodrick Standfield testified that he also responded to the crime scene that morning and discovered Bowie's body lying on the front porch with one foot still inside the window. She appeared to have suffered shotgun wounds to the face and torso. The inside of the home appeared to have been ransacked; broken glass and blood drops were "all over" and there were "pools of blood in every room."

---

[3] Under the circumstances, Thomas was unable to make a positive identification of the man with the shotgun.

Standfield also observed spent shotgun shells.

Sergeant Daniel Nunez, a crime scene unit supervisor, investigated the murder scene and concluded that someone had used "a good amount of force" to break into the home through the front window. Blood patterns near the window were "consistent with someone breaking in, pushing in through the window," cutting an arm, and starting to bleed. Sergeant Richard Rodriquez with the HPD Homicide Division opined based on his experience and training that the window initially was broken by someone coming in through the window and not by Bowie having fallen out through the window. He further explained that it appeared someone had walked through the house "spurting out blood." When appellant was arrested, he had two severe lacerations on his arm, which Rodriquez stated would explain the blood pattern observed at the home. Subsequent DNA testing of blood samples taken at the home produced positive matches to appellant's blood. Rodriquez additionally noted that only two items found in the home appeared to belong to a male—a pair of jeans and a pair of boots—and that a vehicle registration receipt found among appellant's possessions and dated November 6, 2012, showed a different address than Bowie's home for appellant.

The jury charge permitted the jury to find appellant not guilty, guilty of murder, or guilty of capital murder. The jury found appellant guilty of capital murder.

### Standards of Review

As charged in this case, a person commits capital murder if he intentionally or knowingly causes an individual's death while in the course of committing or attempting to commit burglary. Tex. Pen. Code § 19.03(a)(2). A person commits burglary if, without the effective consent of the owner, he: (1) enters a building or habitation with intent to commit a felony, theft, or an assault, or (2) enters a

4

building or habitation and commits or attempts to commit a felony, theft, or assault. Tex. Pen. Code § 30.02(a)(1), (3).

In assessing whether evidence is sufficient to support a conviction, we view all of the evidence in the light most favorable to the verdict and determine, based on that evidence and any reasonable inferences therefrom, whether any rational fact finder could have found the elements of the offense beyond a reasonable doubt. *Gear v. State*, 340 S.W.3d 743, 746 (Tex. Crim. App. 2011) (citing *Jackson*

*v. Virginia*, 443 U.S. 307, 318–19 (1979)). We may not substitute our judgment for that of the fact finder; rather, we defer to the fact finder to fairly resolve conflicts in testimony, weigh the evidence, and draw reasonable inferences from basic facts to ultimate facts. *Isassi v. State*, 330 S.W.3d 633, 638 (Tex. Crim. App. 2010). If any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt, we must affirm. *McDuff v. State*, 939 S.W.2d 607, 614 (Tex. Crim. App. 1997).

### *Unlawful Entry*

In his first issue, appellant contends that the evidence was insufficient to prove the unlawful entry element of burglary. Appellant emphasizes that he had lived at the home where the murder occurred for four years prior to the murder, the address was listed as his residence on his driver's license, and neighbors observed him regularly coming and going from the home. On that basis, he insists he had an equal right to possession of the property and thus could not be found to have entered without the owner's effective consent.

The record, however, contains numerous pieces of evidence indicating that, while appellant may at one time have had a right to enter and possess the premises, he had lost that right before the murder occurred. This evidence includes:

- Complainant was the sole owner of the property as listed on the property deed.

- On November 2, 2012, more than seven weeks before the murder, a police officer responding to a disturbance call at the residence heard complainant ask appellant to leave.

- Hotel records beginning on the same date, November 2, 2012, show appellant rented a hotel room from that date until the day before the murder.

- A friend of appellant's, who was with appellant for several hours immediately prior to the murder and rode to the crime scene with appellant, reported appellant had several suitcases and bags in his car and told the friend he had "been staying in a room." The same friend stated that when they arrived at the house, appellant banged on the door and complainant told him to come back later. The friend then heard glass break and no longer saw appellant. The clear implications being that appellant had not been staying at the house and did not have a key, the complainant did not want appellant to enter the house at that time, and appellant nonetheless entered by breaking into a window.

- A front window of the home was broken and blood was observed around the window and throughout the house, suggesting an intruder had cut his arm while entering through the window and then walked around the house bleeding. When found, appellant had two severe lacerations on his arm. Blood inside the home was determined to be appellant's.

- After the murder, a search of the premises revealed that the only male-related items in the home were a pair of jeans and a pair of boots, suggesting no male was living in the home at the time of the murder.

- A vehicle registration receipt discovered among appellant's possessions and dated November 6, 2012, showed a different address than the complainant's home for appellant.

This evidence was sufficient for a rational jury to conclude that appellant no longer lived at the home and no longer had the owner's consent to enter the  home

6

at the time of the murder. *See, e.g., Gregg v. State*, 881 S.W.2d 946, 952 (Tex. App.—Corpus Christi 1994, pet. ref'd) ("[T]he evidence is sufficient for a rational trier of fact to have found beyond a reasonable doubt that appellant, who had not been a member of his wife's household for seven months, was not welcome there and was not permitted to just enter in at will."); *Hudson v. State*, 799 S.W.2d 314, 315-16 (Tex. App.—Houston [14th Dist.] 1990, pet. ref'd) (holding burglary defendant had lost right of possession to girlfriend's apartment when, although they once lived together, she later made him move out). The evidence further supports the conclusion that complainant, the homeowner, denied appellant entry shortly before the murder and appellant then forced his way in through a window.[4]

Because the evidence was sufficient to prove the unlawful entry element of burglary, we overrule appellant's first issue.

### Commission of a Felony

In his second issue, appellant contends the evidence was insufficient to prove that when he entered complainant's home, he committed or intended to commit a felony, theft, or assault. Appellant primarily argues under this issue that the State impermissibly attempted to use his murder of complainant in two ways: to establish the murder requirement for capital murder and to establish the felony component of the underlying burglary in order to elevate the murder to capital murder. As the State points out and appellant concedes, however, the Court of Criminal Appeals has held in several cases that a murder occurring after a break-in

---

[4] During oral argument, appellant's counsel pointed out that there was no evidence regarding what, if anything, had transpired on the day of the murder between appellant and the complainant before he arrived at the house. Counsel even speculated that appellant may have been moving back in and simply forgot his key. This argument, however, ignores the evidence suggesting appellant broke in while the complainant was inside the home telling him to come back later. That testimony, along with all of the evidence recited in the text above, clearly

7

supports the conclusion that appellant did not have permission to enter the premises, much less an equal right to possession of the premises on the day of the murder, as counsel suggests.

can indeed serve as both the basis for the murder charge and the underlying felony required for burglary. *See Gardner v. State*, 306 S.W.3d 274, 287 (Tex. Crim. App. 2009) ("In a prosecution for capital murder based on burglary, the requirement that a felony be intended is satisfied by the murder of the victim."); *Homan v. State*, 19 S.W.3d 847, 848 (Tex. Crim. App. 2000) (reversing court of appeals which held the murder of complainant could not be used to turn entry into home a burglary); *Matamoros v. State*, 901 S.W.2d 470, 474 (Tex. Crim. App. 1995) (holding evidence was sufficient to prove burglary component of capital murder where defendant entered complainant's home without his consent and killed complainant).

Nonetheless, appellant urges this court to adopt the reasoning set forth in a dissent in *Homan*, wherein the dissenting justice argued that it would be illogical to allow the State to use the murder of the complainant to "bootstrap" a murder offense into a capital murder offense. 19 S.W.3d 849-51 (Johnson, J., dissenting). Of course, under stare decisis, this court is bound to follow the precedent established by the Court of Criminal Appeals majority. *See Lewis v. State*, 448 S.W.3d 138, 146 (Tex. App.—Houston [14th Dist.] 2015, pet. ref'd); *see also State of Texas ex rel. Vance v. Clawson*, 465 S.W.2d 164, 168 (Tex. Crim. App. 1971) ("The Court of Criminal Appeals is the court of last resort in this state in criminal matters. This being so, no other court of this state has authority to overrule or circumvent its decisions, or disobey its mandates."); *Mason v. State*, 416 S.W.3d 720, 728 n.10 (Tex. App.—Houston [14th Dist.] 2013, pet. ref'd) ("When the Court of Criminal Appeals has deliberately and unequivocally interpreted the law in a criminal matter, we must adhere to its interpretation under the dictates of vertical stare decisis.").

Appellant additionally attempts to distinguish the several Court of Criminal

Appeals cases on this issue, arguing that each of them involved other aggravating factors that are not present in this case. Whether or not the factors noted actually were present in these cases, it is clear that they played no role in the higher court's analysis. In *Gardner*, *Homan*, and *Matamoros*, the Court held that it was the murder of the complainant that completed the burglary, not another aggravating factor. *See Gardner*, 306 S.W.3d at 287; *Homan*, 19 S.W.3d at 848; *Matamoros*, 901 S.W.2d at 474. Accordingly, the lack of other aggravating factors in this case does not necessitate reversal.

Because the evidence was sufficient to prove appellant committed a felony upon his unlawful entry into complainant's home, we overrule his second issue.

The trial court's judgment is affirmed.


/s/      Martha  Hill  Jamison

Justice


Panel consists of Justices Jamison, McCally, and Wise. Publish —

TEX. R. APP. P. 47.2(b).